NO. 26-510

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF WASHINGTON, et al.,

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF EDUCATION, et al.,

*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE
No. 2:25-cv-01228-KKE
The Honorable Kymberly K. Evanson, United States District Court Judge

# PLAINTIFFS-APPELLEES' ANSWERING BRIEF

NICHOLAS W. BROWN
Attorney General

ELLEN RANGE, WSBA #51334
JENNIFER K. CHUNG, WSBA #51583
LUCY WOLF, WSBA #59028
Assistant Attorneys General
WILLIAM MCGINTY, WSBA #41868
CYNTHIA ALEXANDER, WSBA #46019
Deputy Solicitors General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
*Attorneys for State of Washington*

[Additional Counsel on Signature Page]

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. STATUTORY AND REGULATORY AUTHORITIES ..... 3

III. ISSUES PRESENTED ..... 3

IV. STATEMENT OF THE CASE ..... 4

A. The Department of Education ..... 4

1. Principles of equity, accountability, and comity underly Congress's statutory scheme ..... 4

2. Congress established procedural requirements for alleged federal civil rights violations ..... 7

B. The MHSP and SBMH Grant Programs ..... 8

C. The Department Awards Multi-Year Program Grants to Grantees Within Plaintiff States ..... 10

1. The Department's discretionary grant regulations and guidance documents ..... 10

2. The Department sets priorities and selects applications ..... 15

3. The Department issues five-year, multi-million-dollar grant awards, and grantees make progress towards project goals ..... 16

D. Defendants Discontinued Some Program Grants Based on an Unpublished Directive ..... 19

E. After Discontinuing Plaintiffs' Grants, Defendants Denied Reconsideration Requests and Recompeted Funds ..... 22

F. Defendants' Actions Cause Plaintiffs Irreparable Harm ..... 24

G. Procedural History ..... 28

V. STANDARD ....29

VI. ARGUMENT ....30

A. Defendants' Actions Are Subject to APA Review ....30

1. Defendants' Directive procedure is final agency action ....30

2. The Department's grant continuation decisions are cabined by its own continuation regulation, practice, and GEPA ....35

B. Defendants' Actions Were Properly Vacated as Contrary to Law ....40

1. Defendants violated 34 C.F.R. § 75.253(b) by considering new priorities—not grantee performance—when determining whether to continue grants ....40

a. Text and structure ....42

b. History and purpose ....48

c. Statutory scheme ....51

d. The termination regulation and the federal procurement contract's "termination for convenience" clause do not support Defendants' arguments ....53

2. Defendants violated 34 C.F.R. § 75.253(c) by prioritizing new grant awards ....55

3. Defendants violated GEPA rulemaking requirements ....57

4. Defendants acted arbitrarily and capriciously ....59

C. The Record Supports the Injunction ....65

1. The district court's remedy was proper ....66

2. The record supports granting relief to all Plaintiff States .......... 67

VII. CONCLUSION .......... 71

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

Cases

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) .......... 30

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) .......... 46, 66, 68

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 30

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
419 U.S. 281 (1974) .......... 63

*Cal. River Watch v. City of Vacaville*,
39 F.4th 624 (9th Cir. 2022) .......... 44

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .......... 70

*California v. Dep't of Education*,
No. 1:25-cv-10548-AK (D. Mass. June 1, 2026) .......... 34

*CBS v. United States*,
316 U.S. 407 (1942) .......... 69

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
42 F.4th 1024 (9th Cir. 2022) .......... 45

*Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*,
626 F.3d 483 (9th Cir. 2010) .......... 65, 68

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) .......... 49

*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) .......... 41, 54

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004) .......... 45

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 69

*Ctr. for Biological Diversity v. Mattis*,
868 F.3d 803 (9th Cir. 2017) .......... 68

*Dep't of Comm. v. New York*,
588 U.S. 752 (2019) .......... 59

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 64, 65

*Dickson v. Sec'y of Def.*,
68 F.3d 1396 (D.C. Cir. 1995) .......... 59

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
485 U.S. 568 (1988) .......... 54

*FDA v. Wages & White Lion*,
604 U.S. 542 (2025) .......... 62

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 43

*Friends of the Earth v. Laidlaw Env't Servs., Inc.*,
528 U.S. 167 (2000) .......... 34

*Galvez v. Jaddou*,
52 F.4th 821 (9th Cir 2022) .......... 65

*Her Majesty the Queen in Right of Ontario v. EPA*,
912 F.2d 1525 (D.C. Cir. 1990) .......... 31

*In re Cybernetic Servs., Inc.*,
252 F.3d 1039 (9th Cir. 2001) .......... 44

*Ind. Towers of Wash. v. Washington*,
350 F.3d 925 (9th Cir. 2003) ........................................ 34

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ........................................ 41, 55

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ........................................ 56

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................ 38

*Milk Train, Inc. v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) ........................................ 39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 62, 65

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*,
627 F.3d 730 (9th Cir. 2010) ........................................ 56

*National Wildlife Federation v. Espy*,
45 F.3d 1337 (9th Cir. 1995) ........................................ 37

*New Jersey v. OMB*,
No. 1:25-cv-11816-IT, 2026 WL 2069832,
(D. Mass. July 17, 2026) ........................................ 54

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026) ........................................ 34

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) ........................................ 59, 69

*Ocampo v. Holder*,
629 F.3d 923 (9th Cir. 2010) ........................................ 58

*Or. Natural Res. Council v. Allen*,
476 F.3d 1031 (9th Cir. 2007) ........................................ 29

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) .......... 54, 55

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .......... 66

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) .......... 31

*S. Cal. All. of Publicly Owned Treatment Works v. EPA*,
8 F.4th 831 (9th Cir. 2021) .......... 33

*Safari Club Int'l v. Haaland*,
31 F.4th 1157 (9th Cir. 2022) .......... 41

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) .......... 60, 61

*Trout Unlimited v. Pirzadeh*,
1 F.4th 738 (9th Cir. 2021) .......... 35

*Vietnam Veterans of America v. CIA*,
811 F.3d 1068 (9th Cir. 2016) .......... 30, 65

*Washington v. Dep't of Educ.*,
161 F.4th 1136 (9th Cir. 2025) .......... 1, 2, 28, 29, 38, 40

*Washington v. Dep't of Educ.*,
167 F.4th 1241 (9th Cir. 2026) .......... 2, 29, 57, 58, 59, 60, 63

*Washington v. DHS*,
614 F. Supp. 3d 863 (W.D. Wash. 2020) .......... 31

*Washington v. DHS*,
No. 2:25-cv-01401-BJR, 2026 WL 1469538
(W.D. Wash. May 26, 2026) .......... 54

*Washington v. FDA*,
108 F.4th 1163 (9th Cir. 2024) .......... 70

*Webster v. Doe*,
486 U.S. 592 (1988) ........ 39

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) ........ 35

Statutes

5 U.S.C. § 702 ........ 69

20 U.S.C. § 1221(b)(1) ........ 16

20 U.S.C. § 1221(d) ........ 7

20 U.S.C. § 1221-1 ........ 4

20 U.S.C. § 1221e-4 ........ 2, 5, 15, 57

20 U.S.C. § 1223(a) ........ 6, 52

20 U.S.C. § 1225 ........ 6, 52

20 U.S.C. § 1226a ........ 6, 52

20 U.S.C. § 1226c ........ 5, 51

20 U.S.C. § 1226c(1) ........ 5

20 U.S.C. § 1226c(2) ........ 48

20 U.S.C. § 1228a ........ 37

20 U.S.C. § 1228a(a) ........ 4, 37

20 U.S.C. § 1228a(b) ........ 4, 5, 37, 61

20 U.S.C. § 1231a(3) ........ 5, 51

20 U.S.C. § 1231c(b) ........ 6, 52

20 U.S.C. § 1232 ........ 2

20 U.S.C. § 1232(a)(2) .......... 15, 57, 58

20 U.S.C. § 1232(d) .......... 5

20 U.S.C. § 1232(d)(1) .......... 15

20 U.S.C. § 1232a .......... 6, 62

20 U.S.C. § 1232i(b) .......... 7

20 U.S.C. § 1682 .......... 7

20 U.S.C. § 3401(10) .......... 5

20 U.S.C. § 3401(2) .......... 4

20 U.S.C. § 3401(4) .......... 6, 52

20 U.S.C. § 3401(7) .......... 5

20 U.S.C. § 3401(8) .......... 5

20 U.S.C. § 3401(9) .......... 5

20 U.S.C. § 3402(1) .......... 4

20 U.S.C. § 3402(3) .......... 5

20 U.S.C. § 3402(4) .......... 5

20 U.S.C. § 3402(5) .......... 5

20 U.S.C. § 3402(6) .......... 5

20 U.S.C. § 3402(6) .......... 52

20 U.S.C. § 3402(7) .......... 5

20 U.S.C. § 3403(b) .......... 6, 62

20 U.S.C. § 7281 .......... 8

20 U.S.C. § 7281(a)(1)(B) .................................................................. 8

20 U.S.C. § 7371 ................................................................................ 6, 62

20 U.S.C. § 7906a .............................................................................. 6, 62

20 U.S.C. § 7907 ................................................................................ 6, 62

20 U.S.C. § 7907(c)(1) .............................................................................. 6

20 U.S.C. § 7921(a) ................................................................................... 5

20 U.S.C. § 7921(a)(1) ........................................................................ 6, 62

20 U.S.C. § 7927 ........................................................................................ 6

20 U.S.C. § 7929(3) ................................................................................... 5

20 U.S.C. § 7929(4) ................................................................................... 5

20 U.S.C. § 7930(a)(1) ........................................................................ 6, 62

31 U.S.C. § 6303(a) ................................................................................. 54

31 U.S.C. § 6304(1) ................................................................................. 55

42 U.S.C. § 2000d ...................................................................................... 7

42 U.S.C. § 2000d-1 ................................................................................... 7

Bipartisan Safer Communities Act,
Pub. L. No. 117-159, 136 Stat. 1313 (2022) ................................... 10, 38, 49

Department of Education Appropriations Act,
Pub. L. No. 115-245, 132 Stat. 2981 (2018) ............................................... 9

Department of Education Organization Act,
Pub. L. 96-88 (1979)
(codified as amended at 20 U.S.C. §§ 3401-3510) ........................................ 4

Elementary and Secondary Education Act,
Pub. L. 89-10 (1965)
(codified as amended at 20 U.S.C. §§ 6301-7981) .......................................... 4

General Education Provisions Act,
Pub. L. 90-247 (2020)
(codified as amended at 20 U.S.C. §§ 1221-1234i) ........................................ 4

Regulations

2 C.F.R. § 200.329(e) ........................................................................ 47

2 C.F.R. § 200.340(a)(4) ..................................................................... 53

2 C.F.R. § 200.400(g) ........................................................................ 55

34 C.F.R. pt. 75 ................................................................................ 10

34 C.F.R. § 75.1(b) ........................................................................... 36

34 C.F.R. § 75.100 ............................................................................ 11

34 C.F.R. § 75.101 ............................................................................ 11

34 C.F.R. § 75.105 ....................................................................... 11, 43

34 C.F.R. § 75.105(c)(2)(i) ................................................................. 11

34 C.F.R. § 75.110 ....................................................................... 11, 43

34 C.F.R. § 75.118 ............................................................................ 13

34 C.F.R. § 75.201 ............................................................................ 11

34 C.F.R. § 75.210(d) ......................................................................... 11

34 C.F.R. § 75.217 ............................................................................ 11

34 C.F.R. § 75.250 ............................................................................ 48

34 C.F.R. § 75.251(a) ......................................................................... 12

34 C.F.R. § 75.251(b)(2) ........ 12, 48, 53

34 C.F.R. § 75.253 ........ 13

34 C.F.R. § 75.253(a) ........ 42

34 C.F.R. § 75.253(a)(1) ........ 46

34 C.F.R. § 75.253(a)(2) ........ 46

34 C.F.R. § 75.253(a)(4) ........ 46

34 C.F.R. § 75.253(a)(5) ........ 42

34 C.F.R. § 75.253(b) ........ 13, 36, 41, 42, 43, 44, 45, 46, 50

34 C.F.R § 75.253(c) ........ 12, 48, 55, 57

34 C.F.R. § 75.253(f) ........ 45

34 C.F.R. pt. 100 ........ 10

<u>Other Authorities</u>

45 Fed. Reg. 22552 (Apr. 3, 1980) ........ 12, 48

59 Fed. Reg. 30258 (June 10, 1994) ........ 13, 14

84 Fed. Reg. 29180 (June 21, 2019) ........ 9, 15

87 Fed. Reg. 47159 (Aug. 2, 2022) ........ 15

87 Fed. Reg. 60083 (Oct. 4, 2022) ........ 15

87 Fed. Reg. 60137 (Oct. 4, 2022) ........ 15, 16

87 Fed. Reg. 72976 (Nov. 28, 2022) ........ 16

89 Fed. Reg. 15173 (Mar. 1, 2024) ........ 16

89 Fed. Reg. 1982 (Jan. 11, 2024) ........ 50

89 Fed. Reg. 70300 (Aug. 29, 2024) ............................................................ 14

110 Cong. Rec. 7059 (1964) .................................................................. 7, 8, 52

Explanatory Statement,
*Division A-Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2020* (Dec. 16, 2019), https://docs.house.gov/billsthisweek/20191216/BILLS-116HR1865SA-JES-DIVISION-A.pdf ...................................... 9

H.R. Rep. 115-952 (2018)........................................................................... 9

Marc A. Penderson,
*Rethinking the Termination for Convenience Clause in Federal Contracts*, 31 Pub. Cont. L.J. 83 (2001)............................................................ 55

"Performance," Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary/performance ....................... 43

U.S. Department of Education,
*Mental Health Service Professional Demonstration Grant Program,* https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-and-supportive-schools/mental-health-service-professional-demonstration-grant-program#current-year-awards............................... 24

U.S. Department of Education,
*School-Based Mental Health Services Grant Program*, https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-and-supportive-schools/school-based-mental-health-services-grant-program#current-year-awards .............................................. 24

U.S. Department of Education,
*U.S. Department of Education Awards Over $208 Million in Mental Health Grants* (Dec. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-awards-over-208-million-mental-health-grants ....................................................... 23

USAspending.gov,
*Award Profile Grant Summary, Fort Wayne*, https://www.usaspending.gov/award/ASST_NON_S184X230146_091 ................................ 21

USAspending.gov,
*Award Profile Grant Summary, IDOE*, https://www.usas
pending.gov/award/ASST_NON_S184H220197_091 ................................. 21

USAspending.gov,
*Award Profile Grant Summary, Norman*, https://www.usaspending
.gov/award/ASST_NON_S184H240206_091 .............................................. 21

# I. INTRODUCTION

After mass shootings at several public schools, Congress created two grant programs to expand access to school-based mental health services. Schools within Plaintiff States received vital funding through these grant programs, but in 2025 the Department of Education abruptly ended hundreds of these grants, using boilerplate language about the Trump Administration's new priorities. Plaintiff States filed this lawsuit, obtaining a preliminary and then a permanent injunction blocking the move. The Department sought stays of both orders, but this Court rejected both, concluding that the Department's actions were subject to judicial review and likely violated the Administrative Procedure Act. Now, the Department appeals the permanent injunction, rehashing arguments this Court already deemed unpersuasive. This Court should again reject the Department's arguments and affirm the district court.

The Department's primary argument on appeal is that its actions are committed to agency discretion by law and thus unreviewable, but this Court already held that the "statute at issue here … explicitly specifies the two grant programs at issue in this action" and "does not commit broad discretion to the Department, unlike other cases in which the Supreme Court has found agency action committed to discretion by law." *Washington v. Dep't of Educ.*, 161 F.4th

1136, 1140 (9th Cir. 2025) (per curiam) (*Washington I*). Moreover, "the Department is constrained by its own regulations…, which provide meaningful standards for the court to apply[.]" *Id.* What this Court said last year remains true today, and the Department's counterarguments are meritless.

As a fallback, the Department argues that it acted lawfully in ending these grants, but its arguments ignore statutory language, the Department's own regulations, and this Court's prior decisions. The Department discontinued these grants based on a new directive instructing Department personnel to avoid funding any diversity, equity, or inclusion efforts. ER-63-64. But "the General Education Provisions Act (GEPA) requires notice-and-comment rulemaking" for any broad policy like this one, as this Court previously held. *Washington v. Dep't of Educ.*, 167 F.4th 1241, 1245-46 (9th Cir. 2026) (per curiam) (*Washington II*) (citing 20 U.S.C. §§ 1232, 1221e-4). Moreover, the Department acted arbitrarily when it "sent boilerplate discontinuation notices with a disjunctive list of four possible grounds for discontinuation of a specific grant, without ever identifying or explaining which specific ground applied to the grantee in question." *Id.* at 1247. Nothing in the Department's appeal can explain away these fundamental flaws in its illegal actions. This Court should affirm.

## II. STATUTORY AND REGULATORY AUTHORITIES

Plaintiffs reproduce additional statutes in this brief's addendum.

## III. ISSUES PRESENTED

1. The Department issued a memorandum directing Department staff to review and end funding for grants that were inconsistent with new administration priorities. Was the Department's application of this procedure to make grant continuation decisions (referred to as the Directive procedure) final agency action?

2. Did the district court properly vacate the Directive procedure because it was contrary to law and arbitrary and capricious?

3. Did the district court properly set aside the discontinuation decisions, which flowed from the implementation of the Directive procedure, because these decisions were contrary to law and arbitrary and capricious?

4. Defendants did not dispute that applying the Directive procedure to Plaintiff States' grants would cause irreparable harm. Did the district court act within its discretion by issuing a permanent injunction to protect the Plaintiff States from this irreparable harm?

## IV. STATEMENT OF THE CASE

### A. The Department of Education

#### 1. Principles of equity, accountability, and comity underly Congress's statutory scheme

In 1979, Congress established the U.S. Department of Education through the Department of Education Organization Act (DEOA). *See* Pub. L. 96-88 (1979), (codified as amended at 20 U.S.C. §§ 3401-3510). Congress tasked the Department with administering the Elementary and Secondary Education Act (ESEA), which authorizes federal funding for K-12 schools. *See* Pub. L. 89-10 (1965), (codified as amended at 20 U.S.C. §§ 6301-7981). Congress also imposed on the Department the requirements of the General Education Provisions Act (GEPA). *See* Pub. L. 90-247 (2020) (codified as amended at 20 U.S.C. §§ 1221-1234i). The DEOA, ESEA, and GEPA reflect three themes that are relevant to this appeal.

***Equity***. First, Congress commanded the Department "to ensur[e] equal access to equal educational opportunity for every individual." 20 U.S.C. § 3402(1); *see also, e.g.*, *id.* §§ 1221-1, 1228a(a), 3401(2). "To assist the Department in implementing [this] mission," Congress enacted GEPA Section 427, which imposes a "[r]equirement to develop steps to ensure equity" on grant applicants. *Id.* § 1228a(a)-(b). Specifically, the Secretary must require

applicants "to develop and describe" the steps to be taken to "ensure equitable access to, and equitable participation in, the project or activity" "in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a(b) (GEPA Equity Directive).

***Accountability***. Second, Congress set up GEPA "to increase the accountability of Federal education programs to the President, the Congress, and the public" and to measure "the effectiveness of applicable programs in achieving such programs' legislated intent and purposes." *Id*. §§ 1226c, 3402(7); *see also, e.g.*, *id*. §§ 3401(7)-(10), 3402(3)-(6).

Congress overrode the exemption for grants in the Administrative Procedure Act (APA) by requiring notice-and-comment rulemaking for GEPA grants. 20 U.S.C. § 1232(d); *see also, e.g.*, *id*. §§ 1221e-4, 7921(a). Congress requires the Secretary to make significant guidance documents publicly available and provide an opportunity for the public to request modifications. *Id*. § 7929(3)-(4). And Congress requires the Secretary to "collect data… [to] obtain[] objective measurements" showing that programs are "achieving the intended purposes." *Id.* § 1231a(3); *see, e.g.*, *id*. § 1226c(1).

***Comity***. Third, Congress set up the Department to support state and local governments in their administration of education, not to undermine them. Congress recognized that "in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States." 20 U.S.C. § 3401(4). Congress repeatedly affirmed that its governing statutes do not authorize the Department "to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system," *id.* § 1232a, including attempts to control "through a grant, contract, or cooperative agreement." *Id.* § 7907(c)(1); *see also, e.g.*, *id.* §§ 3403(b), 7371, 7906a; 7907, 7921(a)(1), 7930(a)(1).

Consistent with this goal, Congress took pains to authorize deviations from standard federal funding procedures to accommodate local education planning and budget needs. *See id.* § 1223(a) (authorizing forward funding "[t]o… afford[]…State[] and local officers adequate notice of available Federal financial assistance"); *id.* § 1225, 1226a, 1231c(b). Congress intended "that State and local officials…be consulted and made aware of the requirements" before participating in ESEA grant programs. *Id.* § 7927.

### 2. Congress established procedural requirements for alleged federal civil rights violations

Congress reiterated that federal civil rights laws apply to Department grant programs—including robust procedural requirements that the Department must satisfy before cutting off grant funding for alleged discrimination. *Id*. § 1221(d); *see id*. §§ 1232i(b), 1682; 42 U.S.C. § 2000d-1. For instance, Title VI of the Civil Rights Act of 1964 prohibits discrimination in federally funded programs based on race, color, or national origin. 42 U.S.C. § 2000d. Before "termination of or refusal to grant or to continue [federal financial] assistance," Title VI requires the Department to notify the grantee, then attempt to secure compliance "by voluntary means," then secure "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement," then "file[] . . . a full written report" with Congress at least thirty days before the action becomes effective. 42 U.S.C. § 2000d-1.

The congressional record for Title VI makes clear these procedural requirements protect not only grantees from "vindictive" or "punitive" action, but also the school children who would ultimately be harmed by the loss of federal grant funding. 110 Cong. Rec. 7059 (1964) (statement of Sen. Pastore); *see, e.g.*, *id.* at 7060 (providing example that "[c]utoff of [school] lunches . . . will obviously impose a severe hardship upon students who are

intended to be benefited”). With these beneficiaries in mind, Title VI’s supporters repeatedly explained that “[f]und cutoff is a last resort, to be used only if all else fails to achieve the real objective—the elimination of discrimination in the use and receipt of Federal funds.” *Id*. at 7059 (statement of Sen. Pastore). Title VI was “designed to achieve that objective in a manner which puts a premium on voluntary action and is as procedurally fair as it could possibly be.” *Id*. at 7061 (statement of Sen. Pastore).

### B. The MHSP and SBMH Grant Programs

Following tragic public-school shootings, Congress created and began funding two mental health programs serving public schools under Section 4631 of the ESEA: the Mental Health Service Professional Demonstration Grant Program (MHSP) and the School-Based Mental Health Services Grant Program (SBMH) (collectively, Programs). *See* 20 U.S.C. § 7281. Congress authorizes funds under this section to be used for the purpose of “carry[ing] out . . . activities to improve students’ safety and well-being.” *Id.* § 7281(a)(1)(B).

After a former student shot and killed fourteen students and three teachers at a high school in Parkland, Florida, *see Washington v. Dep’t of Educ.,*

No. 2:25-cv-01228-KKE (W.D. Wash. July 8, 2025), ECF No. 50-5 at 8-9,[1] Congress created MHSP and provided $10 million for the new Program. *See* Department of Education Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981, 3099 (2018). Congress described MHSP as a "program to test and evaluate innovative partnerships" between states or high-need schools and institutions of higher education "with the goal of expanding the pipeline of these workers into low-income public elementary schools and secondary schools." H.R. Rep. 115-952, at 543 (2018). Indeed, the Federal Commission on School Safety found a nationally shared, "longstanding concern over limited access to counselors and other health care professionals in high-poverty districts and schools where needs are the greatest." 84 Fed. Reg. 29180, 29181 (June 21, 2019). In 2020, Congress established SBMH by appropriating $10 million "to increase the number of qualified, well-trained . . . mental health professionals that provide school-based mental health services to students." Explanatory Statement, *Division A-Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2020*, at 134 (Dec. 16, 2019).[2]

[1] Citations to previously filed documents refer to ECF and ACMS pagination.

[2] Available at https://docs.house.gov/billsthisweek/20191216/BILLS-116HR1865SA-JES-DIVISION-A.pdf.

In 2022, a gunman shot and killed nineteen students and two teachers at an elementary school in Uvalde, Texas. *See* 7-SER-1805. The Uvalde tragedy spurred a bipartisan Congress to dramatically increase Program funding levels, making available an additional $100 million per year for each Program for fiscal years 2022 through 2026. Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1342 (2022) (BSCA).

## C. The Department Awards Multi-Year Program Grants to Grantees Within Plaintiff States

### 1. The Department's discretionary grant regulations and guidance documents

In administering Program funds, Defendants must abide by governing laws, including GEPA and federal civil rights laws. *See supra* § IV.A. The Department has promulgated regulations that further cabin Defendants' authority under these statutes. *See, e.g.*, 34 C.F.R. pts. 75, 100. The Department also issues and regularly updates a public guidance document, "Grantmaking at ED: Answers to Your Questions About the Discretionary Grants Process." *See, e.g.*, 5-SER-1068-1136 (2010 guidance); 7-SER-1859-1910 (2024 guidance). This guidance document "describes how grant programs that are created by Congress are administered by [the Department] and how the public goes about applying for and receiving discretionary grants." 7-SER-1861.

***Application process***. When the Department announces a new grant competition, it must publish an application notice with the "priorities" established for that year's program, the selection criteria, scoring information, and project performance measures. 34 C.F.R. §§ 75.100, 75.101, 75.105, 75.110, 75.201; *see also, e.g.*, 7-SER-1870-75. The Department uses these published priorities to focus a particular year's grant competition on particular activities and objectives. *See* 34 C.F.R. § 75.105; 7-SER-1872-73. The Department scores the quality of each application using the selection criteria and priorities, ranks the applications, and awards new grants to the strongest applicants. *See* 34 C.F.R. §§ 75.105(c)(2)(i), 75.217; 7-SER-1884-8. The Department also considers the applicant's statement in response to the GEPA Equity Directive. *See* 34 C.F.R. § 75.210(d); *supra* § IV.A.1.

After awarding grants, the Department holds an initial discussion with grantees "to establish a mutual understanding of the specific outcomes that are expected and to clarify measures and targets for assessing the project's progress and results." 7-SER-1888; *see also* 5-SER-1106. In order "to provide basic fairness to applicants for discretionary grants," the Department does not allow grantees "to change the objectives or scope that were established in the

application and scored by reviewers during the application review process." 7-SER-1893; *see also* 5-SER-1111.

Although grantees are subject to monitoring to ensure compliance with established project goals and priorities, the Department assures grantees it will "provide technical assistance to help bring the project back on track" before ending grant funding. 7-SER-1894-95; *see also* 5-SER-1113-14.

***Continuation award process***. The Department generally approves funding for twelve-month budget periods. 34 C.F.R. § 75.251(a). When awarding a new multi-year grant, the Department funds the initial budget period and "indicates [its] intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(b)(2).

Unlike the process for awarding new grants, grantees do not compete for continuation awards, and the priorities for future years' grant competitions are not relevant. *See, e.g.*, 45 Fed. Reg. 22552, 22559 (Apr. 3, 1980). The Department has long required that continuation awards "be funded before funds… are used to make any new grants." *Id.*; 34 C.F.R § 75.253(c).

To receive a continuation award, a grantee must meet five requirements: (1) demonstrate the project has made substantial progress in achieving its objectives and performance targets; (2) submit required performance reports; (3)

meet all eligibility requirements; (4) maintain compliant financial management systems; and (5) "[r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." 34 C.F.R. § 75.253. To determine whether the grantee has met these requirements, the Department considers "any relevant information regarding grantee performance," including performance reports, performance measures, and financial data. *Id.* §§ 75.118, .253(b).

Consistent with these regulations, the Department's longstanding practice is to use grantee performance when evaluating all five requirements. For instance, in 1994, the Department removed a requirement to submit applications for continuation awards. 59 Fed. Reg. 30258 (June 10, 1994). Although continuation funding would still "be based on evidence that the grantee has met the standards for continuation," including the best interest requirement, the Department explained that the continuation award decision would "be based entirely on the submission of [performance] reports." *Id*. at 30259.

Additionally, the Department's grantmaking guidance has long informed grantees that program staff make continuation decisions by "review[ing] the information in the performance report and the grant's financial and project management activities to determine if a grantee has made substantial progress in

reaching the project's objectives . . . and if continuation of the project is in the best interest of the federal government." 5-SER-1108; *see also* 7-SER-1890.

Based on Defendants' prior practice and their own representations, discontinuations were the rare exception, not the rule, and the Department worked with grantees to avoid discontinuation if possible. *See, e.g.*, 59 Fed. Reg. at 30259 (discontinuances are "extremely rare in practice"), 89 Fed. Reg. 70300, 70316 (Aug. 29, 2024) ("In general, we do not deny a large number of non-competing continuation awards . . . . [A]nd, if that does happen, grantees are often aware of . . . the decision well in advance."); *see, e.g.*, 7-SER-1894-95 (monitoring and providing technical assistance); 5-SER-1113-14 (same). Indeed, the Department updated the continuation application process in 1994 partly to move away from an "'enforcement' mentality…at the expense of a collaborative and assisting attitude." 59 Fed. Reg. at 30259.

This collaborative approach is consistent with grantees' unrebutted experiences working with the Department. *See, e.g.*, 1-SER-138; 6-SER-1454, 1472, 1525; ER-30 n.9 (noting grantees provided "undisputed statements . . . indicat[ing] that grant discontinuances or terminations were extremely rare before 2025").

### 2. The Department sets priorities and selects applications

In 2019, the Department published a notice inviting applications for the first MHSP grant competition and setting inaugural program priorities. 84 Fed. Reg. 29180 (June 21, 2019). These initial regulations were exempted from APA rulemaking requirements. 20 U.S.C. § 1232(d)(1). However, in subsequent years, the Department used rulemaking to add new priorities for future MHSP competitions. *See id.* §§ 1221e-4, 1232(a)(2), (d)(1); *see, e.g.*, 87 Fed. Reg. 47159 (Aug. 2, 2022) (proposed priorities), 87 Fed. Reg. 60083 (Oct. 4, 2022) (final priorities). The Department also used rulemaking for SBMH competition priorities. *See, e.g.*, 87 Fed. Reg. at 60092 (final priorities).

The Department invited applications for new MHSP grants for fiscal year 2022 and announced it would consider three priorities for that year's competition. *See* 87 Fed. Reg. at 60145. Two priorities were each worth up to five points: "Increase the Number of Qualified School-Based Mental Health Services Providers in High-Need LEAs Who Are From Diverse Backgrounds or From Communities Served by the High-Need LEAs" and "Promote Inclusive Practices." *Id*. at 60146. The notice explained, "Non-Federal peer reviewers will evaluate and score each application" using additional criteria such as "Quality of the project design (Up to 25 points)." *Id*. at 60149. The Department repeated

this process for MHSP competitions in fiscal years (FY) 2023 and 2024, and for SBMH competitions. *See* 87 Fed. Reg. 60137 (Oct. 4, 2022) (SBMH FY2022); *id*. 72976 (Nov. 28, 2022) (MHSP FY2023); 89 Fed. Reg. 15173 (Mar. 1, 2024) (SBMH FY2024), *id*. at 15180 (MHSP FY2024).

MHSP and SBMH are "applicable programs" subject to GEPA. 20 U.S.C. § 1221(b)(1); 4-SER-995 (Answer ¶ 49). Accordingly, the Department's application forms implemented the GEPA Equity Directive. For instance, the 2022 SBMH application instructed in bold, all-caps text that "**ALL APPLICANTS** . . . **MUST INCLUDE INFORMATION IN THEIR APPLICATIONS TO ADDRESS [GEPA SECTION 427] IN ORDER TO RECEIVE FUNDING UNDER THIS PROGRAM.**" 4-SER-904; *see also* 3-SER-764-66 (2024 example).

### 3. The Department issues five-year, multi-million-dollar grant awards, and grantees make progress towards project goals

Plaintiffs are sixteen states whose public schools offer mental health services supported by Program grants. When grantees applied, they tailored their projects to the priorities for that year's Program competition to make their applications competitive. *See, e.g.*, 4-SER-897-985 (example SBMH grant application); 4-SER-768-896 (example MHSP grant application). Grantees also responded to the GEPA Equity Directive requirement by including statements

about equity in their applications. *See, e.g.,* 3-SER-712-29, 764-66; 4-SER-904-05.

For example, Northwest Educational Service District 189 (NWESD), a local educational agency that serves as a regional liaison between Washington State and thirty-five Washington school districts, applied for an SBMH grant for fiscal year 2022. *See* 4-SER-897, 910. Within NWESD's service area, students cannot access critical mental health services due to barriers such as geographic isolation, high student to provider ratios, attrition, complexity of mental health challenges, cultural and linguistic barriers, and a healthcare system that is overwhelmed. 4-SER-913.

NWESD's grant proposal addressed this critical need. The project would "recruit, place, support, and retain" twenty additional school-based mental health providers, increasing access for up to 5,000 students annually. 4-SER-910. NWESD proposed hiring ten providers in Year 1, then adding three-four more providers each subsequent year. 4-SER-925. NWESD also proposed using grant funds to increase its retention rate for mental health professionals. 4-SER-927.

In alignment with a competitive priority to increase the number of qualified providers from diverse backgrounds, and in compliance with the GEPA Equity Directive, NWESD proposed reviewing job descriptions, offering equity-

related training, and establishing relationships with cultural groups. 4-SER-926-27. NWESD also attached a statement titled "Compliance with General Education Provisions Act Section 427." 4-SER-905.

Based on its application, the Department awarded NWESD a SBMH grant award that would provide over $11 million in funding over a five-year performance period. *See* 3-SER-758. NWESD outperformed initial expectations, improving its mental health provider-to-student ratio by 60%, and making substantial progress towards its target ratio by December 2027. 5-SER-1222-23; *see generally* 5-SER-1293-95 (grant performance report). In 2024, NWESD provided 795 individual students with 7,870 service sessions—treatment that students may not have otherwise been able to access. 5-SER-1223. In December 2024, the Department issued NWESD a continuation award with almost $2.5 million in funding for 2025. *See* 5-SER-1234.

The Department sent e-mails to NWESD and other grantees confirming they "ha[d] made substantial progress towards achieving the goals and objectives of the project, and the grant's performance targets." 5-SER-1059; *see also* 1-SER-145; 2-SER-412; 5-SER-1060-66. And student testimonials drive home just how much kids benefited from having access to grant-funded mental health services at school. *See* 3-SER-736-55.

### D. Defendants Discontinued Some Program Grants Based on an Unpublished Directive

On February 5, 2025, without public notice and comment, Defendants issued a "Directive on Department Grant Priorities" that addressed "Eliminating Discrimination and Fraud in Department Grant Awards" (the "Grant Priorities Directive"). ER-63. The Grant Priorities Directive instructed Department personnel to re-review grants, "ensuring that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to the [Department's view of civil rights] law or to the Department's policy objectives," and asserted new priorities of "merit, fairness, and excellence in education." ER-63-64. This Directive caused Defendants to depart from their prior procedure of relying on performance and financial data when deciding whether to continue a multi-year grant. ER-18-21. The district court referred to the new procedure as the "Directive procedure." ER-21.

On April 29, 2025, Defendants notified several hundred grantees *en masse* that their grants would be discontinued under 34 C.F.R. §75.253. *See* 1-SER-33. These discontinuance notices were "generic and identical," ER-23, and stated:

> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law;

> conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; ***or*** constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

ER-12 (emphasis added). These notices did not reference grantees' performance as a basis for the discontinuances.[3] ER-65-66. The disjunctive list meant that grantees did not know which basis applied to them. *See, e.g*, 5-SER-1224; 6-SER-1498-99. Even their program officers did not know. *See, e.g.*, 6-SER-1504. Of the 339 program grants eligible for non-competing continuation awards, 223 were discontinued nationally, including about 140 grants in Plaintiff States. 1-SER-33-34.

Defendants also notified Congress, stating they had determined the discontinued grants "reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration," and declaring, "[t]he prior Administration's preferences are not legally binding." 7-SER-1799. Defendants made clear that they discontinued these grants so they could prioritize funding for new grants that aligned with the new

[3] Defendants provide an example of a Grant Award Notification (GAN) issued to a new grantee in 2023. *See* ER-70-77. But the better reference is the continuation award issued at the end of 2024, as that was the operative GAN when grants were discontinued. *See, e.g.*, 5-SER-1232-88.

Administration's priorities. 7-SER-1800 ("The Department plans to re-envision and re-compete its mental health program funds[.]").

Defendants did not discontinue other Program grantees even though they served the same prior Administration's priorities as the discontinued grants. For instance, following the *en masse* discontinuances, journalists reported that "[t]he Indiana Department of Education, Fort Wayne Community Schools in Indiana, and Norma[n] Public Schools in Oklahoma" had not been discontinued. 7-SER-1809.[4] But the Indiana Department of Education (IDOE) received an SBMH grant from the same competition as NWESD. *See* 7-SER-1836 (NWESD abstract), 1848-49 (IDOE abstract). IDOE's project reflects those SBMH grant competition priorities, as its activities include "creating a talent pipeline of mental health service providers whose racial and ethnic backgrounds parallel their students," but its grant was not discontinued. 7-SER-1848-49. Fort Wayne's project met all three MHSP competitive priorities and included "ensur[ing] that service providers are well-trained in inclusive practices for all

[4] In December 2025, Defendants issued continuation awards to all three grantees. *See* USAspending.gov, *Award Profile Grant Summary*, https://www.usaspending.gov/award/ASST_NON_S184X230146_091 (Fort Wayne); USAspending.gov, *Award Profile Grant Summary*, https://www.usaspending.gov/award/ASST_NON_S184H240206_091 (Norman); USAspending.gov, *Award Profile Grant Summary*, https://www.usaspending.gov/award/ASST_NON_S184H220197_091 (IDOE).

students," but its grant was not discontinued, either. 7-SER-1821. And Norman's project met an SBMH competitive preference priority that Defendants admitted was to increase the number of mental health providers from diverse backgrounds, without being discontinued. *See* 7-SER-1826-27; *compare* ER-103-04 (Complaint ¶ 84), *with* 4-SER-1001 (Answer ¶ 84).

### E. After Discontinuing Plaintiffs' Grants, Defendants Denied Reconsideration Requests and Recompeted Funds

Although Defendants offered discontinued grantees the option of requesting reconsideration, "[t]he complete lack of explanation . . . preclude[d] a meaningful opportunity to seek reconsideration." ER-25 n.6. Nonetheless, many grantees initially requested reconsideration of the discontinuances, but Defendants denied almost all requests. *See* 1-SER-33-34. Like the initial discontinuation notices, the reconsideration denials uniformly recited the same disjunctive list, including the unpublished priorities of "merit, fairness, and excellence in education." ER-67. Instead of reviewing each grantee's performance, Defendants relied solely on language addressing DEI that the grantee "state[d] in [their] approved grant application." *Id.*; *see generally* 2-SER-227-60, 263-372 (reconsideration denials). These reconsideration denials often quoted the grantee's GEPA equity statement. *See, e.g.*, 2-SER-231 (quoting excerpt from "General Education Provisions Act (GEPA) Statement"

at 3-SER-723); *see also, e.g.*, 2-SER-227 (quoting 3-SER-720); 2-SER-233 (quoting 3-SER-726, 729); 2-SER-237 (quoting 4-SER-905); 2-SER-259 (quoting 3-SER-717); 2-SER-289 (quoting 3-SER-715).

Instead of prioritizing continuation awards over funding new applicants, as required by 34 C.F.R. § 75.253(c), Defendants ran a new competition while this litigation was pending and awarded $208 million in new grant awards on December 11, 2025. *See* U.S. Department of Education, *U.S. Department of Education Awards Over $208 Million in Mental Health Grants* (Dec. 11, 2025).[5] Although these new grantees included a few grantees in Plaintiff States, they did not replace all of the services provided by the discontinued grants. For example, Defendants discontinued 139 grants within Plaintiff States, 1-SER-34, but only awarded twenty-three new grants within Plaintiff States following the competition.[6]

[5] Available at https://www.ed.gov/about/news/press-release/us-department-of-education-awards-over-208-million-mental-health-grants.

[6] *See* U.S. Department of Education, *School-Based Mental Health Services Grant Program*, https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-and-supportive-schools/school-based-mental-health-services-grant-program#current-year-awards (last visited Aug. 17, 2026) (ten new SBMH grants); U.S. Department of Education, *Mental Health Service Professional Demonstration Grant Program,* https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-and-supportive-schools/mental-health-service-professional-demonstration-grant-program#current-year-awards (last visited Aug. 17, 2026) (thirteen new MHSP grants).

### F. Defendants' Actions Cause Plaintiffs Irreparable Harm

The unrebutted record reflects extensive evidence of the irreparable harm that Defendants' discontinuances caused, and would continue to cause, absent permanent injunctive relief. *See, e.g.*, 4-SER-1016-19, 1026-28 (summarizing evidence and finding harm), ER-11-13, 36-37 (same); 4-SER-1039-46; 1-SER-66-72 (declaration indices); *see generally* 8-SER-1932-34, 1947-52, 5-SER-1158-59 (preliminary injunction briefing) (citing 4-SER-1047-54; 5-SER-1164-1343; 6-SER-1345-1630; 7-SER-1632-1792); 3-SER-681-85, 702-06 (summary judgment briefing) (citing *id.* & 1-SER-73-133, 142-222; 2-SER-373-521; 3-SER-523-665). These Programs were implemented amidst a national youth mental health crisis. *See, e.g.*, 2-SER-511; 3-SER-579. Considering the alarming rise in youth suicide and attempted youth suicide over the past decade, *id.*, any loss of preventative services has devastating effects.

Without continued funding, the programs supported by SBMH grants would end, with destructive consequences including layoffs of project staff and mental health service providers, reducing access to much-needed mental health services for students. *See, e.g.*, 1-SER-146-47; 5-SER-1225; 6-SER-1577-78; 7-SER-1746 (example SBMH grantees). These providers were hired, retained, and trained using Program funds as part of Congress's goal to permanently add

thousands of new providers to schools throughout Plaintiff States. *See, e.g.*, 1-SER-147; 5-SER-1225-26; 6-SER-1574-75; 7-SER-1744-45. Grantees would also lose the benefits of the relationships and trust that these providers developed with students and school staff members, and the stability they have provided. *See, e.g.,* 5-SER-1227, 1229; 6-SER-1578; 7-SER-1746-47.

Similarly, MHSP grantees would lose robust tuition assistance for their mental health graduate programs, causing graduate students to drop out, reducing the number of graduate student interns providing services in schools, and cutting off the pipeline of future school-based mental health professionals. *See, e.g.*, 5-SER-1202-03, 1215-16, 1303-04; 6-SER-1473-74, 1525-30 (example MHSP grantees). This in turn will reduce access to much needed mental health services for the public schools and students that the grant-funded interns serve, harming grantees' relationships and reputation. *See, e.g.*, 5-SER-1302-03; 6-SER-1473, 1526-29, 1601-02. For instance, one grantee had already selected twenty students for scholarships when it received its discontinuation letter, and it was ultimately only able to offer ten scholarships—resulting in the loss of services to at least 5,000 students at high-need schools in Washington state due to fewer interns. 4-SER-1037. Grantees will also be unable to monitor graduate students who received conditional scholarships to ensure

they comply with their contractual obligation to work in high-need schools after graduation or provide post-graduation support and licensure supervision. *See, e.g.*, 5-SER-1203-04, 6-SER-1352-53.

Grantees invest considerable time and resources when preparing a multi-year grant application. *See, e.g.*, 1-SER-140; 4-SER-975-82 (providing detailed budget narrative and matching funds); 4-SER-837-66 (providing letters of support from partners). Grantees had been willing to make these investments because they understood they had a right to a continuation award process that was based on grantee performance, rather than factors outside the grantee's control, and they structured their projects and budgets based on this understanding. *See, e.g.*, 1-SER-139-40; 5-SER-1199, 1212-14, 1299-1300, 1314. The discontinuances harmed grantees' procedural rights and called into question grantees' rights and expectations as to the continuation award process for multi-year discretionary grants.

Plaintiff States also faced the harm of rising Medicaid costs due to the loss of grant-funded mental health services in schools. *See* 3-SER-683-84, 703-04 (citing 1-SER-163-71; 2-SER-496-521; 3-SER-560-67, 577-89, 615-18, 638-45). For instance, the Medicaid Director for the Oregon Health Authority explained:

> While community-based services cost the same as similar school-based services, taking youth away from schools to receive services has additional impacts that result in higher levels of cost for the families and the state in transportation, wages lost, and beyond. Youth who do not receive services in a timely manner may require higher levels of care, including crisis intervention services, which come at a higher cost to the state ($112.87 per 15 minutes) than outpatient services, require more state resources, and in rural counties may also place a burden on first responders outside the cost of healthcare services. Delayed initiation of care often results in need for more intensive services in addition to outpatient care.

ER-36 (quoting 1-SER-169); *see also id*. (citing 2-SER-501-08, 515-20; 3-SER-565-66, 618, 643); 3-SER-587-89.

The loss of grant funding would also harm Plaintiff States due to the increased burdens of providing an appropriate education to students entitled to mental health services. *See* 3-SER-684-85, 704-06 (citing 1-SER-89-100, 172-79; 2-SER-413-25, 438-68; 3-SER-630-37). For instance, the State Superintendent of Education for the Illinois State Board of Education (ISBE) explained:

> In recent years, parents have filed an increasing number of due process hearing requests and state special education complaints with ISBE. To address the growing complaint volume, ISBE has since 2023 contracted with private attorneys to investigate and adjudicate due process complaints. During the 2024-2025 school year, ISBE spent a total of $417,000 responding to due process hearing requests.

ER-37 (quoting 1-SER-178-79). ISBE anticipated these costs would be exacerbated by the non-continuation of the federal grants as parents increasingly file complaints to "obtain necessary school-based mental health services for their children." 1-SER-179; *see also, e.g.*, 1-SER-94-96; 2-SER-422-24, 444, 452-53, 465-67; 3-SER-636.

### G. Procedural History

Plaintiffs filed this action on June 30, 2025, and moved for a preliminary injunction. *See* ER-78-125; 8-SER-1912-56. Defendants moved to dismiss, raising jurisdictional objections. *Washington*, No. 2:25-cv-01228-KKE (W.D. Wash. Sept. 5, 2025), ECF No. 161. The district court denied Defendants' motion and granted Plaintiffs' preliminary injunction. ER-42-62; 4-SER-1010-35. Defendants sought an emergency stay pending appeal, based entirely on their jurisdictional defenses, so they could use funds frozen by the preliminary injunction to issue awards to new grantees under their new competition. *See Washington I*, 161 F.4th at 1139; *Washington v. Dep't of Educ.*, No. 25-7157 (9th Cir. Nov. 14, 2025), DktEntry 7.1 at 2. This Court unanimously denied the motion. *Washington I*, 161 F.4th at 1139.

The district court then granted Plaintiffs' motion for summary judgment, holding that Defendants acted arbitrarily and capriciously and contrary to law;

vacating and enjoining implementation of Defendants' Directive procedure, discontinuances, and reconsideration request denials for grantees within Plaintiff States; and entering declaratory judgment clarifying grantees' rights. ER-39-41. With the dissolution of the preliminary injunction, Defendants withdrew their original appeal. *See* Order, *Washington*, No. 25-7157 (9th Cir. Jan. 14, 2026), DktEntry 50.1. Defendants sought another emergency stay pending appeal of the permanent injunction, which this Court again unanimously denied. *See Washington II*, 167 F.4th at 1241. On remand, the district court set new deadlines to make continuation decisions, and Defendants ultimately continued most of the grants. *See* 1-SER-10-15. Defendants now appeal the merits of the district court's summary judgment order and permanent injunction.

## V. STANDARD

This Court reviews a district court's summary judgment de novo. *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007). A permanent injunction involves factual, legal, and discretionary components, so the Court reviews a decision to grant such relief under several different standards: legal conclusions are reviewed de novo, factual findings for clear error, and the scope of the injunction for abuse of discretion. *Vietnam Veterans of America v. CIA*, 811 F.3d 1068, 1075 (9th Cir. 2016).

# VI. ARGUMENT

## A. Defendants' Actions Are Subject to APA Review

### 1. Defendants' Directive procedure is final agency action

The evidence before the district court established conclusively that the Department enacted a new, secret policy to measure grants according to new administration priorities when evaluating them for continuation. The institution of a new policy like this is final agency action subject to review under the APA.

Defendants contest that the Directive procedure constituted "final agency action" subject to review under the APA. Opening Br. 32-33, 39, DktEntry 36.1. Final agency actions (1) "mark the consummation" of agency decision-making, and (2) determine "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). Finality is interpreted in a "pragmatic" and "flexible" manner. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967). "Agency action . . . need not be in writing to be final and judicially reviewable." *Washington v. DHS*, 614 F. Supp. 3d 863, 872 (W.D. Wash. 2020) (citations omitted); *see also id.* at 872 n.11 (citing cases); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (collecting cases); *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531

(D.C. Cir. 1990) ("[T]he absence of a formal statement of the agency's position . . . is not dispositive.").

The Directive procedure changed the Department's longstanding practice—memorialized in decades of rulemaking, guidance documents, and the plain language of 34 C.F.R. § 75.253(b)—from making continuation decisions based on grantee performance to making decisions based on the current Administration's new priorities. *See supra* § IV.C.1 (describing prior process). Defendants adopted this new policy on or before April 29, 2025, because their boilerplate discontinuance notices reflect the Directive procedure. The notices made no mention of grantees' performance; rather, they stated that Program grants were being discontinued because they conflicted with the current Administration's new priorities of "merit, fairness, and excellence in education." ER-63; *see also* 7-SER-1799. Defendants repeated this reason in their reconsideration denial letters. *See generally* 2-SER-227-372.

This policy change has clear legal consequences: grantees have lost the benefit of a fair continuation award determination based on their performance and financial information under 34 C.F.R. § 75.253(b), and the priority of continued funding over new grant awards promised by 34 C.F.R. § 75.253(c).

*See infra* § VI.B.1-.2. The Directive procedure is final agency action reviewable under the APA.

Defendants attempt to persuade this Court that the Directive procedure is not final agency action by changing the facts. Instead of a procedural change profoundly affecting the stability once promised by a continuation process based on grantees' performance, Defendants characterize the Directive procedure as mere instructions for Department staff to follow in reviewing grants. Opening Br. 32. However, the district court properly found the Directive's instructions to be final agency action because the Department announced generally applicable priorities, ER-63; changed the continuation procedure to allow consideration of these new priorities instead of reviewing performance against established priorities and financial data, *see, e.g.*, *supra* § IV.C.1; and discontinued grants based on these new priorities, *see, e.g.*, *supra* § IV.D. *See* ER-18-21.

Defendants wrongly argue that these instructions are not final agency action because they required additional agency decision-making before creating non-speculative, practical consequences. Opening Br. 32-33. But it is black letter law that agency action may be final prior to application. *Prutehi Litekyan: Save Ritidian v. Dep't of Airforce*, 128 F.4th 1089, 1110 (9th Cir. 2025) ("[A] federal agency's assessment, plan, or decision qualifies as final agency action even if

the ultimate impact of that action rests on some other occurrence—for instance, a future site-specific application, a decision by another administrative agency, or conduct by a regulated party.").

Defendants' reliance on *Southern California Alliance of Publicly Owned Treatment Works v. EPA*, 8 F.4th 831 (9th Cir. 2021), is misplaced. There, an EPA guidance document set out an optional testing method that state authorities could adopt as part of their permitting processes—meaning the guidance had no "practical consequences" unless a state chose to start using it. *Id.* at 837; *see also id*. at 838 (describing EPA's efforts to encourage states to use challenged method). This Court emphasized that "the 'if'" of whether the permitting authorities would adopt the test was "key." *Id.* at 837.

Here, in contrast, the Directive was imperative, not suggestive: "Department personnel *shall* conduct an internal review"; "This Directive *shall* be implemented by all ED personnel"; and "Grants deemed inconsistent with these priorities *shall* . . . be terminated." ER-63-64 (emphasis added). And the results of the Directive procedure were immediate—grantees were suddenly vulnerable to discontinuance based on the new Administration's policy and priority preferences. 7-SER-1799 (declaring "[t]he prior Administration's preferences are not legally binding" and discontinuing grants based on new

priorities). Although Defendants now try to cleave the consequences from the instructions, they previously conceded the Grant Priorities Directive led directly to the discontinuances. *See* Mot. Emergency Stay 10, 16, DktEntry 7.1.

Defendants also passingly argue mootness, based on representations in another case that the Grant Priorities Directive was superseded by a June 2025 memorandum that was not included in *this* case's administrative record, but this anemic argument does not meet their burden. *See* Opening Br. 32; *Ind. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003); 3-SER-678 n.2 (cataloguing record). Plaintiffs challenged Defendants' Directive procedure, which Defendants applied to discontinue grants based on the new unpublished priorities stated in the Grant Priorities Directive—not the Grant Priorities Directive itself. *Cf. New York v. Trump*, 171 F.4th 1, 16 (1st Cir. 2026). As this procedure and the very same unpublished priorities (albeit in Defendants' "superseding" guidance) continue to threaten grantees, this case is not moot. *See Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); Murray Bessette Aff. Ex. A, at 2, *California v. Dep't of Education*, No. 1:25-cv-10548-AK (D. Mass. June 1, 2026), ECF No. 155-1 (June 2025 memo applying same priorities of "merit, fairness, and excellence in education") (affidavit cited at Opening Br. 32).

### 2. The Department's grant continuation decisions are cabined by its own continuation regulation, practice, and GEPA

This is not one of the "rare circumstances" where the APA's "basic presumption of judicial review" is overcome due to the lack of a meaningful standard against which to judge the agency's exercise of discretion. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22-23 (2018) (citation omitted). The exception in 5 U.S.C. § 701(a)(2) for actions "committed to agency discretion by law" does not apply "[e]ven where statutory language grants an agency unfettered discretion, [because] its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751-52 (9th Cir. 2021). As this Court has previously held, there is such a standard here.

Defendants provided meaningful standards to review this decision by promulgating a continuation regulation and describing their practice in guidance documents. Despite this, Defendants claim unmitigated discretion to discontinue grants they claim are not in the best interest of the federal government.[7] Opening

[7] Throughout their brief Defendants suggest that they have unmitigated discretion over "discretionary" grants. *See, e.g.*, Opening Br. 26, 27. However, by regulatory definition, "discretionary" only applies to Defendants' selection of new grants for funding. 34 C.F.R. § 75.1(b).

Br. 19. Congress also provided standards that the Department must comply with through GEPA, including notice and comment requirements and the statutorily required equity statement that the Department found justified discontinuation—directly contrary to Congress's intent. *See supra* § IV.A.

The Department's continuation regulation, 34 C.F.R. § 75.253, governs the challenged agency action and limits materials the Department may consider in making a continuation decision to "relevant information regarding grantee performance." 34 C.F.R. § 75.253(b), *see also infra* § VI.B.1. The agency's long-standing guidance reflects the same standards. *See supra* § IV.C.1. This guidance states that the Department will review performance and financial information when making the best interest determination. *See* 5-SER-1108; 7-SER-1890. Both the continuation regulation and this guidance provide a meaningful standard of review against which this Court may measure Defendants' actions.

GEPA also provides a meaningful standard to review Defendants' actions. Even putting aside GEPA's notice-and-comment rulemaking requirements, *see infra* § VI.B.3, the GEPA Equity Directive shows that, according to Congress, equity in education is in the best interest of the federal government. 20 U.S.C. § 1228a.

*National Wildlife Federation v. Espy*, 45 F.3d 1337 (9th Cir. 1995), is instructive. In *Espy*, this Court held that a mandatory *statutory* duty imposed by Congress showed that Congress "conclusively determined" this duty was in the best interest of the federal government, limiting a federal agency's *regulatory* "best interest" determination. *Id.* at 1342 n.6. Likewise, here, Congress imposed an equitable mission on the Department, 20 U.S.C. § 1228a(a), and a duty to take steps to achieve this mission, including requiring applicants to explain how they will "overcome barriers to equitable participation" in their grant applications. *Id.* § 1228a(b); *see also, e.g.*, *supra* §§ IV.A.1, IV.C.2 (discussing Congress's statutory emphasis on equity and GEPA Equity Directive). By imposing this duty, Congress "conclusively determined" that equity in education, including addressing equity in grant applications, is in the best interest of the federal government. *Espy*, 45 F.3d at 1342 n.6. In light of these standards, Defendants fail to show that their Directive procedure and discontinuances were "committed to agency discretion by law."

Nor does *Lincoln v. Vigil*, 508 U.S. 182, 185 (1993), affect this analysis. *See Washington I*, 161 F.4th at 1140. Under *Lincoln*, a lump-sum appropriation law committed an agency's allocation of those funds to agency discretion.

508 U.S. at 185. Defendants' argument that *Lincoln* is an apt analogy is misplaced for two reasons.

First, the relevant statute identified by Defendants, the BSCA, is not a lump-sum appropriations bill allowing the agency to spend the money in any way that meets permissible statutory objectives. *See* Opening Br. 20. In *Lincoln*, the discontinued program was not even mentioned in the relevant appropriations act. *Lincoln*, 508 U.S. at 193-94. Here, to the contrary, the BSCA expressly directed Defendants to spend $1 billion "for carrying out School Based Mental Health Services Grants" and "Mental Health Services Professional Demonstration Grants." 136 Stat. at 1342; *see supra* § IV.B.

Second, Defendants misidentify the challenged agency action. Plaintiffs are not contesting Defendants' allocation of funds from a lump sum appropriation; rather, they contest Defendants' unlawful procedural change and their resulting discontinuances based on new priorities. Any discretion Defendants might have had, they cabined through their regulations and guidance documents. Defendants cannot refute these standards, so their § 701(a)(2) arguments ignore them. *See* Opening Br. 18-26.

The instant case is a world apart from the other cases Defendants lean on, such as *Webster* and *Milk Train*, where Congress passed laws committing the

relevant action to agency discretion. In *Webster v. Doe*, Congress committed the CIA Director's decision to terminate an employee to agency discretion. 486 U.S. 592, 600-01 (1988). In *Milk Train, Inc. v. Veneman*, the relevant statute, directing that certain funds be provided "in a manner determined appropriate by the Secretary," committed to agency discretion decisions regarding the provision of funds. 310 F.3d 747, 751 (D.C. Cir. 2002).

But here Congress has not committed discontinuance decisions to the agency. Instead, Defendants purport to enjoy unfettered discretion based on a *regulation* that they themselves promulgated. *See* Opening Br. 16 (arguing that regulatory "best interest" determination gives Defendants the same broad discretion as "best interest" standard in statutes). And as explained above, the challenged agency actions are not of the kind *Lincoln* treated as committed to agency discretion. Defendants identify no statutory provision committing their continuation decisions to agency discretion.

There are meaningful standards against which to review Defendants' actions, and Plaintiffs are entitled to judicial review. *See Washington I*, 161 F.4th at 1140 (rejecting Defendants' unreviewability argument).

## B. Defendants' Actions Were Properly Vacated as Contrary to Law

Applying those standards, the district court properly held the Directive procedure, the discontinuances, and the denials of reconsideration were contrary to law because they violated the continuation regulation by considering new priorities instead of grantee performance and giving priority to new applications over continuation awards, and they violated GEPA's notice-and-comment requirements. Defendants' actions were also arbitrary and capricious.

### 1. Defendants violated 34 C.F.R. § 75.253(b) by considering new priorities—not grantee performance—when determining whether to continue grants

The district court correctly enjoined Defendants from "[c]onsidering new priorities or any other information that is not relevant and similar to the information listed in 34 C.F.R. § 75.253(b) when determining whether a grant within Plaintiff States has met the requirements for a continuation award under 34 C.F.R. § 75.253(a)." ER-40.

Defendants' claim that the § 75.253(a)(5) "best interest" determination gives the Department unfettered discretion to discontinue grants ignores the limitations placed throughout the regulation, including 34 C.F.R. § 75.253(b). Defendants' argument is contrary to the text, structure, and purpose of the continuation regulation and the Department's statutory and regulatory framework

for discretionary grantmaking. Defendants' interpretation also raises serious constitutional concerns, as the Spending Clause does not allow the Department to impose ambiguous or retroactive grant conditions. *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1174-75 (9th Cir. 2019).

When interpreting a regulation, "[the Court's] task is to interpret the regulation as a whole, in light of the overall statutory and regulatory scheme, and not to give force to one phrase in isolation." *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1171 (9th Cir. 2022). An agency's interpretation is afforded no deference unless the regulation is "genuinely ambiguous." *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019). "[I]f there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense." *Id*. at 575. Otherwise, this would "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Id*. To determine whether "a rule is genuinely ambiguous," the court "must carefully consider the text, structure, history, and purpose of [the] regulation." *Id*. (citation modified). Here, all considerations unambiguously show that 34 C.F.R. § 75.253 does not allow Defendants to consider new priorities when making continuation award decisions.

**a. Text and structure**

Paragraph (a) of the continuation regulation sets out five requirements a grantee must satisfy to receive a continuation award. *See* 34 C.F.R. § 75.253(a). The fifth requirement states that the grantee "must . . . [r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." *Id*. § 75.253(a)(5).

The plain text of paragraph (b) sets forth the information that the Department may consider when determining whether a grantee has met the requirements of paragraph (a), including the (a)(5) "best interest" determination and focuses on grantee performance:

> ***Information considered in making a continuation award.*** In determining whether the grantee has met the requirements described in paragraph (a) of this section, the Secretary may consider any relevant information regarding grantee performance. This includes considering [performance] reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information.

*Id*. § 75.253(b). This paragraph thus limits the "[i]nformation considered" by Defendant to "any relevant information regarding grantee performance," and provides three illustrative examples: performance reports, performance measures, and financial information. *Id*. It then makes clear that the Department can consider information relating to grantee performance (including, for

instance, future performance) other than these three things by repeating the phrase “any other relevant information.” *Id.*

New administration priorities are not, under any reasonable definition, “information regarding grantee performance.” The definitions of “performance” include “the execution of an action” and “the ability to perform.”[8] New priorities have nothing to do with performance, because performance is measured against priorities baked into the design of the grant project. *See* 34 C.F.R. §§ 75.105, 75.110, 75.253(b); *supra* § IV.C.1.

Multiple interpretive principles underscore this conclusion. Under the *ejusdem generis* principle, § 75.253(b)’s list excludes new priorities because they do not fit the common attributes of these specific, performance-related items and therefore do not fall under that list’s catch-all for “any other relevant information.” *See Fischer v. United States*, 603 U.S. 480, 487 (2024) (“A general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it.”) (citation modified). Additionally, “relevant information” appears twice in paragraph (b). Under the presumption that “words used more than once in the same [regulation] have the

[8] *See* “Performance,” Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/performance (last accessed Aug. 15, 2026)

same meaning throughout," the Court can presume that "relevant information" in the catch-all refers to "relevant information regarding grantee performance" only. *See In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1051 (9th Cir. 2001) (presuming that when Congress used the same words twice in the same statute, it intended to refer to the same thing).

By its plain terms, paragraph (b) applies to the subparagraph (a)(5) best interest determination, as paragraph (b) sets forth the "[i]nformation considered in making a continuation award" and addresses "the requirements described in paragraph (a) of this section." 34 C.F.R. § 75.253(b). This conclusion is reinforced by the proximity between the best interest "determination" in subparagraph (a)(5) and the information used when "determining" whether the (a) requirements are met in paragraph (b). *Cf. Cal. River Watch v. City of Vacaville*, 39 F.4th 624, 632 (9th Cir. 2022) (concluding "the proximity between 'transporter' and 'transportation' suggests… similar meanings").

Other paragraphs of the regulation provide further support. For instance, paragraph (f) allows the Department to discontinue a grant if (1) the grantee does not meet the paragraph (a) requirements or (2) the data submitted by the grantee is not "quality data." 34 C.F.R. § 75.253(f). The second situation presupposes that the Department would normally assess whether the grantee met the

paragraph (a) requirements based on the grantee's performance data, but it could not accurately do so due to data quality issues.

Defendants contend that because it uses "may," paragraph (b) simply "provides examples of the sorts of materials the Secretary is most likely to consider, rather than limiting the Secretary's discretion." Opening Br. 30. But "[d]epending on the context, 'may' can be limiting, meaning '*may only*.'" *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1034-35 (9th Cir. 2022). That situation is present here where there is a "list of . . . specific topics followed by a catch-all" and "it is more natural to read 'may' in its restrictive sense, as 'may only.'" *Id*. To read it otherwise would "render part of the [regulation] entirely superfluous," as there would be no reason to specify the "[i]nformation considered in making a continuation award." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166 (2004); 34 C.F.R. § 75.253(b). Given Defendants' argument that the information in paragraph (b) "maps on to" the other requirements in paragraph (a), there would also be no reason to include this provision simply to "provide[] examples," as other requirements in paragraph (a) already largely address "reports required by § 75.118, performance measures established under § 75.110," and "financial

information required by 2 CFR part 200." Opening Br. 30; *compare* 34 C.F.R. § 75.253(b), *with id*. §§ 75.253(a)(1), (a)(2), (a)(4).

Defendants' newly asserted argument that paragraph (b) merely "limit[s] the factual reports that the Department may review," Opening Br. 30-31, fails for multiple reasons. First, Defendants waived this argument by not raising it to the district court. *Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014); *see generally* 1-SER-16-31, 36-65. Second, these "factual reports" measure grantee performance against established priorities and therefore definitively exclude new priorities. Defendants' "current policy preferences," including new priorities, cannot change the benchmark grantees agreed to use when they accepted their grant awards. *See* 7-SER-1893 (explaining that "to provide basic fairness to applicants for discretionary grants," the Department does not allow grantees "to change the objectives or scope that were established in the application").

Defendants additionally claim that paragraph (b) "at most limit[s] the factual reports that the Department may review," and they contend the district court's decision was not "premised on any contention that the agency considered factual materials that it was not permitted to consider." Opening Br. 30-31. Contrary to Defendants' assertion, however, the district court *did* hold that the Department considered improper material by "re-reviewing only Grantees'

applications, rather than considering their activities since the initial awards were disbursed." ER-34. Defendants do not dispute this finding. *See also* ER-22 n.5 (observing that "the reconsideration denial letters reference only the original Grant applications" and "[t]he Department has not argued it considered any information beyond the initial grant awards").

Similarly, applying paragraph (b) to the best interest determination would not render that requirement superfluous. *See* Opening Br. 28. Aside from performance reports, Defendants may also consider significant developments affecting future grantee performance; *i.e.*, whether the grant will continue to serve the purposes for which Congress appropriated funding. For instance, a grantee might meet the first four requirements of paragraph (a), but there might be other "significant developments . . . which will impact the recipient's . . . ability to meet milestones or the objectives of the Federal award." 2 C.F.R. § 200.329(e). It may not be in the government's best interest to continue a project that encounters a significant development that will seriously impede *future* performance, such as an earthquake that destroys the school performing the project, or the sudden departure of critical team members.

**b. History and purpose**

The regulation's history and purpose support Plaintiffs' interpretation of paragraph (b) to exclude new priorities when Defendants make their subparagraph (a)(5) best interest determination.

For decades, Defendants have strived to "ensure consistent treatment" of continuation decisions, stated that multi-year grants "will not be subject to competition" for continuation funding, and prioritized the continuation of projects over funding new grants. 45 Fed. Reg. at 22559. Accordingly, the Department's regulatory framework promotes the continuation of multi-year projects and contemplates that these projects may span multiple administrations. *See, e.g.*, 34 C.F.R. § 75.250 ("The Secretary may approve a project period of up to 60 months . . . . "); *id*. § 75.251(b)(2) (when approving a multi-year project period, the Secretary "indicates [their] intention to make continuation awards to fund the remainder of the project period"); *id*. § 75.253(c) ("[T]he Secretary gives priority to continuation awards over new grants.").

These regulations reflect Congress's expectation that it can take years for these projects to achieve their goals and that the Programs are structured for multiple years. *See, e.g.*, 20 U.S.C. § 1226c(2) (requiring biennial report on

"progress being made toward the achievement of program objectives"); *accord* BSCA, 136 Stat. at 1342 (funding Programs for five years).

Defendants' claim that a new Administration can simply discontinue existing grants because it "vehemently disagrees" with "priorities established by a prior Administration" is completely at odds with the Department's regulatory scheme. Opening Br. 29. Even if the continuation regulation were somehow ambiguous (it is not), "defer[ring] to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties fair warning of the conduct [a regulation] prohibits or requires." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (citation omitted).

Additionally, the parties agree that "priorities" are only used "[w]hen selecting applications for new grants." Opening Br. 28. Indeed, the grant competition process requires applicants to meet those priorities to win an award. *See supra* § IV.C.1-.2 (describing process). As a result, grantees tailor their projects to that year's grant priorities—not some unknown, future set of priorities. *Accord* Opening Br. 28 (progress typically measured by "whether a project furthers the priorities set at the start of a grant contest"). The regulatory purposes of consistency and fairness are not served by allowing Defendants to

interfere with grantees' multi-year, multi-million-dollar projects—and interject factors outside the grantee's control—by changing the rules and imposing new priorities partway through the grant's approved project period.

Indeed, in 2024, the Department updated §75.253 to "clarify" "the process and requirements for making continuation awards." 89 Fed. Reg. 1982, 1990 (Jan. 11, 2024). The previous version of paragraph (b) only applied to one of the paragraph (a) requirements (substantial progress). *See* 34 C.F.R. § 75.253(b) (2023) (addressing information used "in deciding whether a grantee has made substantial progress"). The 2024 update clarified that the information considered under §75.253(b) applies to *all* of the §75.253(a) requirements. *See* 34 C.F.R. § 75.253(b). The Department explained: "These proposed changes would reflect existing Department practices and provide a clearer description of the relevant requirements and procedural rights of grantees in the continuation awards process." 89 Fed. Reg. at 1991. The record shows the Department's "existing practices" limited consideration to performance and financial information when determining whether continuation was in the government's best interest. *See supra* § IV.C.1 (discussing agency guidance and practice). As the district court noted, Defendants "identified no part of the history of the regulatory scheme

suggesting that the 'best interest' criterion has ever operated in the way the Department now claims." ER-29-30.

### c. Statutory scheme

Plaintiffs' interpretation also aligns with the applicable statutory framework. For example, Defendants argue that if they cannot consider new priorities as part of the best interest determination, this "would force the government to continue to commit funds based on outdated priorities" even if there were a change in circumstances "such that a particular program were no longer needed." Opening Br. 29. But this argument incorrectly assumes that the Administration—not Congress—decides the purposes for which Program funds are appropriated. *See supra* § IV.A.1.

The statutory scheme repeatedly reflects Congress's constitutional role in deciding how these appropriations will be used. *See, e.g.*, *id.*; 20 U.S.C. § 1226c (requiring Secretary to transmit biennial "evaluation report on the effectiveness of applicable programs in achieving such programs' legislated intent and purposes"); *id.* § 1231a(3) (requiring Secretary to "collect data and information on applicable programs for the purpose of obtaining objective measurements of the effectiveness of such programs in achieving the intended purposes of such programs"). If *Congress* believes "a particular program [is] no longer needed,"

Opening Br. 29, that decision should be (and is) reflected in whether *Congress* continues to appropriate funds for that program.

Defendants' construction also conflicts with other parts of the statutory scheme. Congress established the Department to, among other things, "improve the management and efficiency of Federal education activities." 20 U.S.C. § 3402(6). It would not be efficient to allow a new Administration to discontinue multi-year grants with a demonstrated history of serving Congress's goals, in favor of new untested grants that the Department prefers simply because they meet the new Administration's priorities.

Additionally, Congress made clear that the Department's role is to support the state and local school systems that have "the primary public responsibility for education." *Id.* § 3401(4); *see generally supra* § IV.A.1. Congress authorized deviations from standard federal funding procedures to ensure that States, school districts, and schools would be able to effectively plan and budget their educational programs. *See, e.g.*, 20 U.S.C. §§ 1223(a), 1225, 1226a, 1231c(b). Congress understood that interruptions to federal funding would ultimately harm the children who were provided services by that funding. *See, e.g.*, 110 Cong. Rec. 7060 (statement of Sen. Pastore). Nor would it strengthen state and local governments and schools to allow a new Administration to upend their long-

term educational strategy, planning, and budgets by discontinuing grants that are meeting performance goals and for which the Secretary had "indicate[d] [their] intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(b)(2). This is especially true where, as here, a Program includes a cost-sharing requirement—meaning it is not only a grantee's budget that would be upended by Defendants' expansive construction, but also the budgets of partnering schools. *See, e.g.*, 5-SER-1228 (describing partial match from 15 partner school districts to meet SBMH requirements).

#### d. The termination regulation and the federal procurement contract's "termination for convenience" clause do not support Defendants' arguments

Defendants also contend that "authority to stop distributing federal funds based on the government's current policy preferences is an ordinary feature of federal grant programs." Opening Br. 29. They rely solely on a single regulation that permits the termination of grants, in some circumstances, "if an award no longer effectuates the program goals or agency priorities." *Id*. (quoting 2 C.F.R. § 200.340(a)(4)). But contrary to Defendants' characterization, courts have held that this provision "does not permit agencies to terminate grants based on program goals and agency priorities identified *after* grants were awarded." *New Jersey v. OMB*, No. 1:25-cv-11816-IT, 2026 WL 2069832, at *11

(D. Mass. July 17, 2026) (emphasis added); *see also Washington v. DHS*, No. 2:25-cv-01401-BJR, 2026 WL 1469538, at *9 (W.D. Wash. May 26, 2026) (collecting cases). Indeed, to hold otherwise would violate the Spending Clause by imposing an ambiguous or retroactive grant condition—changing the priorities used to determine whether a grant award should be continued. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988); *Barr*, 929 F.3d at 1174-75; *see also id*. at 1175 n.6 (applying Spending Clause to agency-drawn conditions).

Nor can the best interest provision be treated like a contractual "termination for convenience" clause. Procurement contracts and grant agreements serve fundamentally different purposes. *See Pacito v. Trump*, 169 F.4th 895, 925-26 (9th Cir. 2026) (discussing the Federal Grant and Cooperative Agreement Act of 1977). Procurement contracts are commercial transactions whose "principal purpose . . . is to acquire . . . property or services for the direct benefit or use of the United States Government." *Id*. (quoting 31 U.S.C. § 6303(a)). Courts have viewed the Government's contractual termination for convenience power broadly because there is a judicial presumption that the contract price reflects a premium the contractor charges for assuming the risk of termination. *See* Marc A. Penderson, *Rethinking the Termination for Convenience Clause in Federal Contracts*,

31 Pub. Cont. L.J. 83, 94-95 (2001). In contrast, grant agreements confer no direct benefit on the Government and instead are used "to carry out a public purpose of support or stimulation authorized by a law of the United States." *Pacito*, 169 F.4th at 926 (quoting 31 U.S.C. § 6304(1)). Grantees are not permitted to "earn or keep any profit resulting from" their grant awards unless explicitly authorized. 2 C.F.R. § 200.400(g). If the grant is still "carry[ing] out a public purpose" authorized by Congress, it makes no sense to allow termination for the Administration's convenience.

The "only . . . reasonable construction" of 34 C.F.R. § 75.253 is that Defendants cannot use new priorities when determining whether a grantee has met the requirements to receive a continuation award. *Kisor*, 588 U.S. at 575.

**2. Defendants violated 34 C.F.R. § 75.253(c) by prioritizing new grant awards**

The district court correctly found that Defendants also violated the continuation regulation by failing to prioritize continuation awards over new grants as required by paragraph (c). 34 C.F.R. § 75.253(c); *see, e.g.*, ER-34. Defendants blatantly violated this subsection when they used funds from wrongfully discontinued grants to fund new grants that reflected their new priorities. *See* ER-63-64 (internal directive requiring review of "issued grants" to determine whether they are "inconsistent with [the new] priorities");

7-SER-1799-1800 (stating intention to use funds freed from discontinuances to fund projects aligned with the new Administration's preferences); *see supra* §§ IV.D-.E. At a post-judgment hearing, Defendants claimed that they could only fund Plaintiffs' grants for six months, because Defendants had recompeted the remaining funds. *See* 1-SER-5 ("The reason they only received six months' funding… strictly is a function of the fact that the other monies were competed before the injunction was issued. And the monies went out and we had a certain amount of funding available for these grantees.").

Although paragraph (c) is "[s]ubject to the criteria in paragraphs (a) and (b) of the continuation regulation," that does not mean that (c) may be rendered superfluous. *See* Opening Br. 38. "Provisions of a statute should be read so as not to create a conflict." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370 (1986); *see Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 737 (9th Cir. 2010) ("It would be odd if the Act took away . . . with one hand what it granted with the other."). But under Defendants' broad interpretation of the best interest requirement, paragraph (c) quickly loses relevance. Defendants could simply decide—every time—that a continuation is not in the government's best interest, effectively

negating the Department's self-imposed regulatory priority in favor of continuation awards over new grants. 34 C.F.R. § 75.253(c).

**3. Defendants violated GEPA rulemaking requirements**

As this Court previously held, Defendants violated statutory rulemaking requirements by using unpublished priorities to discontinue grants. *Washington II*, 167 F.4th at 1245-47.

Under GEPA, Congress requires the Department to undergo notice-and-comment rulemaking for "any generally applicable rule, regulation, guideline, interpretation, or other requirement that (1) is prescribed by [Defendants]; and (2) has legally binding effect . . . affecting[] the provision of financial assistance." 20 U.S.C. § 1232(a)(2), (d); *see also id.*, § 1221e-4. These procedures provide vital accountability, transparency, and fairness and support multiple Congressional purposes. *See generally supra* § IV.A.1.

There is no dispute that the Department engages in this rulemaking process when setting priorities and preferences that will be used to evaluate grant applications, and indeed, originally used those processes here. Opening Br. 34-35; *supra* § IV.C. There is no dispute that Defendants did not engage in notice-and-comment rulemaking when setting the new criteria it used to evaluate grants for discontinuation. As the Directive procedure prescribed a

"generally applicable . . . requirement" that "ha[d] legally binding effect" affecting grant continuation decisions, Defendants violated GEPA's rulemaking requirements by using unpublished priorities. 20 U.S.C. § 1232(a)(2); *see Washington II*, 167 F.4th at 1245 ("The directive mandated an across-the-board review of all new grant awards and the re-review of all issued grants in accordance with the Department's new policy objectives, resulting in the discontinuation of grants in Plaintiff States.").

Defendants argue the Department "fully complied" with GEPA's requirements because it used notice-and-comment rulemaking when it adopted the best interest provision, and the best interest standard allows the Department to consider new interests or policies without further rulemaking. Opening Br. 31-32. But they provide no legal authority whatsoever for the remarkable proposition that an agency can promulgate its own regulatory escape hatch to avoid statutory requirements. To the contrary: "[A] regulation may not serve to amend a statute." *Ocampo v. Holder*, 629 F.3d 923, 927 (9th Cir. 2010).

Defendants' other arguments revolve around its claim that the Directive procedure was not a final agency action. *See, e.g.*, Opening Br. 32-33. But as explained earlier, the district court correctly determined that the Directive procedure qualified as a final agency action. *See supra* § VI.A.1. By ordering

Department personnel to review "all . . . issued grants" using new unpublished priorities and mandating that "[g]rants deemed inconsistent with these priorities shall . . . be terminated," ER-63-64, Defendants used a generally applicable rule affecting the provision of financial assistance without rulemaking, in violation of GEPA.

#### 4. Defendants acted arbitrarily and capriciously

Defendants' secretive and unexplained change in policy violated the arbitrary and capricious standard many times over. Defendants have an obligation to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Comm. v. New York*, 588 U.S. 752, 773 (2019) (citation omitted). As this Court earlier held, boilerplate notices without factual findings are the epitome of an arbitrary and capricious action, because they fail to articulate a satisfactory explanation. *See Washington II*, 167 F.4th at 1247; *see also Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 689 (9th Cir. 2007) ("similar letter[s]" "baldly asserting" conclusory statements did not provide a reasoned explanation); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995). Disjunctive explanatory lists are similarly defective, because they require guesswork by the grantee as to which

basis applies. *See Washington II*, 167 F.4th at 1247; *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).

Defendants' April 29 notices of non-continuation did not clear this bar. Defendants did not consider the relevant information—performance and financial data—and provided no factual findings, nor drew a rational connection between any facts and Defendants' conclusion that the grant was not in the Federal Government's best interest. ER-24. Instead, Defendants disjunctively listed four theoretical bases for the grant discontinuances and did not identify which, if any, of these bases applied specifically to the grantee, let alone what the grantee allegedly did to trigger that basis. *Id*. Even the first hypothetical basis, "violates the letter or purpose of Federal civil rights laws," contained a myriad of possibilities, pushing past comprehensibility to outright speculation: did the grantee violate federal anti-discrimination laws addressing race or national origin? Sex? Age? By keeping it unspecified, Defendants avoided the procedural protections these laws afforded, giving grantees no opportunity to address any compliance issues before they lost their funding. *See supra* § IV.A.2, (discussing federal civil rights procedures). Nor did Defendants explain why they discontinued *these* grants but not *other* grants that met the same grant

competition priorities regarding diversity. *See supra* § IV.D (discussing non-discontinued grants).

The reconsideration denials are no better. Defendants again did not consider performance or financial data. *See generally* 2-SER-227-60, 263-372. Although they pulled specific "diversity," "equity," and "inclusion" excerpts from the applications, the denials do not articulate a rational connection between these quotes and Defendants' denial. *Id.* And Defendants continued to use the same disjunctive list, so grantees still had to guess which bases Defendants relied on. *Id*. Such guesswork renders Defendants' actions arbitrary and capricious. *Chenery Corp.*, 332 U.S. at 196-97.

Moreover, Defendants instructed applicants to comply with the GEPA Equity Directive by describing the steps they will "take to ensure equitable access to, and equitable participation in," their projects, and then discontinued grants for following this very instruction. 20 U.S.C. § 1228a(b); *see supra* §§ IV.A.2, IV.C.2-3. It is not rational to discontinue grantees for following Defendants' own instruction, yet that is what Defendants did. *See generally* 2-SER-227-60, 263-372 (reconsideration requests denied because "approved grant application" contained phrases supporting equity). Indeed, by using grantees' compliance with the GEPA Equity Directive as a basis to discontinue

grants, Defendants "relied on factors which Congress has not intended it to consider[.]" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Other factors impermissibly considered by Defendants appear to include program administration, personnel, and/or curriculum—areas that Congress repeatedly reserved to the States, school districts, and schools. *See, e.g.,* 20 U.S.C. §§ 1232a, 3403(b), 7371, 7906a, 7907, 7921(a)(1), 7930(a)(1); 2-SER-227, 229, 315, 345.

Defendants' other arguments to prop up their discontinuation decisions ignore reality and binding precedent. Opening Br. 35-37. Defendants' brazen assertion that "[t]he clear thrust of the notices was that grants at issue here advance the sorts of DEI programs that the Department disfavors," *id.* 36, runs headlong into the reality that those notices did not mention DEI at all. *See* ER-65-66.[9] While it may be true that, in some instances, as Defendants hypothesize, a common explanation for a common characteristic may suffice, this requires the common explanation to be comprehensible. *See FDA v. Wages & White Lion*, 604 U.S. 542, 545 (2025) (providing detailed explanation why

[9] Defendants' recent fulsome embrace of the DEI rationale contrasts sharply with their denial and obfuscation during litigation. *See, e.g.*, 1-SER-52-53 (denying Plaintiffs' claims that grants were discontinued based on their compliance with the GEPA Equity Directive).

applicants had not provided sufficient scientific evidence) (cited in Opening Br. 35). And although the Supreme Court stated a court needed only to reasonably discern the agency's path in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, at least there the federal agency had supplied regulated parties a *conjunctive* list for its rationale. *See* 419 U.S. 281, 286-87 (1974). This case does not support Defendants' use of a wide-ranging *disjunctive* list.

Here, grantees were confronted with a disjunctive list that ranged from student well-being to inappropriate use of funds. *See* ER-65. From this list, grantees could not reasonably be expected to identify the supposedly unifying theory that their grants supported DEI. *See Washington II*, 167 F.4th at 1247 (explaining notices never identified which "specific ground applied to the grantee in question," were not tailored to specific grants, "and failed to explain what was wrong with each grantee's project"). Defendants claim Plaintiffs "do not identify any project" for which they cannot determine the factual basis for non-continuation, Opening Br. 37, but Defendants have not been paying attention. Plaintiffs' declarations (and there were many) stated that the recipient of the letter could not identify the basis for their discontinuance from the list. *See, e.g.*, 5-SER-1224 ("Based on this boilerplate language, [grantee] has no way

of knowing which reason(s) applied as the Department's basis for discontinuing the SBMH grant[.]"); *see generally* 5-SER-1164-1343; 6-SER-1345-1630; 7-SER-1632-1792. Even their program grant officers were at a loss as to which basis applied to them. *See, e.g.*, 6-SER-1504. Defendants also suggest that the "factual basis" may be found by reviewing the reconsideration request denials in the administrative record. Opening Br. 36. However, not every grantee requested reconsideration, and the Court should reject post-hoc explanations for Defendants' April 29 discontinuances. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020).

Regarding the Directive procedure, Defendants cannot defend their change in position from reviewing performance and finances to considering new priorities, so they divert attention to the continuation regulation and deny a change in position occurred. Opening Br. 39. Having denied any change in position, Defendants failed to explain or consider reliance interests. And although disclaimers may weaken the strength of a reliance interest, there is no precedent for considering disclaimers outside of the document setting forth the agency's position as Defendants invite this court to do. *See* Opening Br. 37-38 (asking Court to consider "disclaimers" in non-operative grant terms and non-specified publicity). Nonetheless, the Supreme Court mandated that the agency

consider reliance interests, which Defendants did not do. *See Regents*, 591 U.S. at 31.

In sum, Defendants failed to engage in any "reasoned decisionmaking" whatsoever and their actions were resoundingly arbitrary and capricious. *See Motor Vehicle*, 463 U.S. at 52.

### C. The Record Supports the Injunction

Defendants include a short argument challenging the district court's remedy and the scope of its injunction. *See* Opening Br. 40-42. However, because none of the issues in Defendants' Statement of the Issues "fairly encompasses" any argument about the remedy or injunction, the Court need not address them. *Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010) (*CLS*); *see* Opening Br. 7 (identifying only two issues).

Regardless, the record supports the district court's remedy and the injunction's scope, which is reviewed for abuse of discretion. *Vietnam Veterans of America*, 811 F.3d at 1075. To determine whether a district court abused its discretion in entering an injunction, courts assess whether the court's decision "resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir 2022). Here, the district court properly

vacated the Directive procedure as to discontinued grantees within Plaintiff States, vacated the discontinuation notices and letters denying reconsideration, remanded for new continuation decisions, and enjoined Defendants from considering new priorities when making continuation decisions. *See* ER-39-41.

#### 1. The district court's remedy was proper

Defendants argue the Court should have allowed the Department to engage in notice-and-comment rulemaking. Opening Br. 40. But Defendants never asked the district court for this remedy, thereby waiving this argument now. *See Armstrong*, 768 F.3d at 981; 1-SER-16-31, 36-65. Regardless, the district court did not abuse its discretion by entering an injunction without providing an opportunity for notice-and-comment rulemaking because even if Defendants could cure all procedural defects, they cannot consider new priorities when determining whether a grantee has met the requirements for a continuation award under 34 C.F.R. § 75.253—even if those new priorities have gone through rulemaking. *See supra* § VI.B.1; *cf. Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) ("[F]undamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand.").

Defendants argue the district court should have remanded the non-continuation decisions "for the Department to further elaborate its reasoning."

Opening Br. 41. But the district court *did* remand the decisions, and the Department ultimately discontinued several grants on remand. *See* 1-SER-14-15. The court properly enjoined Defendants from considering new priorities on remand, as this would violate the continuation regulation. *See supra* § VI.B.2.

**2. The record supports granting relief to all Plaintiff States**

Finally, although Defendants do not dispute "the standing of plaintiff-states with grantees that are components of the state government," they argue the district court "erred . . . in extending relief to other plaintiff-states."[10] Opening Br. 41; *see also id*. 18 ("[T]here is no basis for any injunction in the states that have not identified any public institutions that are affected by the Department's action here."). However, Defendants conflate their standing arguments with their arguments contesting the scope of the injunction. *See Washington,* No. 2:25-cv-01228-KKE (W.D. Wash. Sept. 5, 2025), ECF No. 161 at 2, 7-8. Defendants never suggested there were Plaintiff States without state-component grantees when challenging the scope of the proposed injunction before the district court,

[10] Defendants' concession that at least some Plaintiff States have standing means this state-component grantee issue does not affect the Court's jurisdiction. *See Biden v. Nebraska*, 600 U.S. 477, 489-94 (2023); *see, e.g.*, 5-SER-1193-1205 (declaration from University of Washington, a component of Plaintiff State Washington).

let alone identified any Plaintiff State they believed should be excluded from the injunction on this basis. *See* 1-SER-62-64.[11] As such, the district court had no opportunity to rule on the fact-intensive issue of which Plaintiff States should be included in the injunction because they have grantees that are components of the state government, and which ones should be excluded because they have no such grantees. The argument is therefore waived. *See Armstrong*, 768 F.3d at 981 (concluding party waived arguments about scope of injunction). Nor should the Court exercise its discretion to consider this waived issue, as none of the exceptions apply. *See id*.

Regardless, a Plaintiff State would still be entitled to relief even if none of the grantees within that State were a component of state government, due to the nature of APA relief and the district court's finding, based on unrebutted evidence, that Defendants' unlawful continuation of any grants within Plaintiff States' borders would cause irreparable harm to Plaintiffs. *See* ER-34-38.

[11] During summary judgment briefing, Defendants did single out one Plaintiff State (Nevada), because its grants had not been discontinued. But Defendants do not raise this issue on appeal, and the Court should not address it. *See CLS*, 626 F.3d at 485. Regardless, the district court properly granted relief to Plaintiff Nevada. *See* 1-SER-134-41; *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 816-21, 826-27 (9th Cir. 2017).

The APA grants a right of review and relief to any person "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. It is "typical" for "[a]n unregulated plaintiff" to "sue under the APA to challenge an allegedly unlawful agency rule that regulates others but also has adverse downstream effects on the plaintiff." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J. concurring). As such, the APA allows Plaintiffs to challenge the discontinuation of grants within their states, even if they weren't awarded to a state entity. 5 U.S.C. § 702; *see also, e.g.*, *CBS v. United States*, 316 U.S. 407, 422 (1942) (broadcasting network had standing to sue over agency's announced plan to deny licenses to broadcasting stations, even though networks were not parties to the stations' licenses); *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 679 (9th Cir. 2007) (environmental groups had standing under the APA even though they were not parties to the grant).

Further, the district court did not abuse its discretion in finding that Plaintiff States suffered "direct harms . . . from the Department's actions," justifying injunctive relief. ER-35 n.12. This finding was based on multiple declarations from state health authorities showing that Plaintiff States would be harmed by rising Medicaid costs due to the loss of any grant, as well as the

unrebutted inference that any Plaintiff State with discontinued grants within its borders would suffer similar harm to its Medicaid system. *See id.*; *supra* § IV.F. The district court's finding was also supported by multiple declarations from state departments of education showing the loss of any grant would harm Plaintiff States' education systems, due to the increased burdens of providing an appropriate education to students entitled to mental health services. *See supra* § IV.F.

Even if a Plaintiff State were not directly injured as the recipient of a discontinued grant, this evidence supports a "strong 'causal chain' that 'links' the federal action to the alleged harm," justifying relief. *Washington v. FDA*, 108 F.4th 1163, 1175 (9th Cir. 2024) (*FDA*) (quoting *California v. Azar*, 911 F.3d 558, 571-72 (9th Cir. 2018)). This is unlike in *FDA*, where this Court rejected an intervenor state's purported Article III injury that started with the FDA's lack of regulating someone else and depended on a highly attenuated chain of healthcare decisions by independent actors leading to indirect impacts to Idaho. *Id.* at 1174; *see also id.* at 1170-71.

Here, Congress funded the Programs to address a national youth mental health crisis. Defendants' discontinuance of federally funded mental health services would predictably cause children in low-income areas, who have shown

a need for these services, to turn to state-funded Medicaid mental health services. *See supra* § IV.F. Likewise, given the dearth of mental health providers in low-income areas, these children predictably have less access to mental health services, causing an increased strain on Plaintiff State's education systems. *Id.* Defendants contested none of these harms.

## VII. CONCLUSION

The Court should affirm the district court's summary judgment order and permanent injunction.

RESPECTFULLY SUBMITTED this 17th day of August 2026.

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Ellen Range*
ELLEN RANGE, WSBA #51334
JENNIFER K. CHUNG, WSBA #51583
LUCY WOLF, WSBA #59028
Assistant Attorneys General
WILLIAM MCGINTY, WSBA #41868
CYNTHIA ALEXANDER, WSBA #46019
Deputy Solicitors General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
Ellen.Range@atg.wa.gov
Jennifer.Chung@atg.wa.gov
Lucy.Wolf@atg.wa.gov
William McGinty@atg.wa.gov
Cynthia.Alexander@atg.wa.gov

*Attorneys for State of Washington*

ROB BONTA
Attorney General of California

*/s/ Crystal Adams*
CRYSTAL ADAMS
Deputy Attorney General
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
KATHERINE MILTON
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
916-210-7522
Crystal.Adams@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Katherine.Milton@doj.ca.gov

*Attorneys for State of California*

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Shannon Wells Stevenson*
SHANNON WELLS STEVENSON
Senior Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
Shannon.Stevenson@coag.gov

*Attorney for State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Andrew Ammirati*
ANDREW AMMIRATI
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorney for State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Vanessa L. Kassab*
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Vanessa.Kassab@delaware.gov

*Attorneys for the State of Delaware*

KWAME RAOUL
Attorney General of Illinois

*/s/ Sarah A. Hunger*
SARAH A. HUNGER
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-835-0148
Sarah.Hunger@ilag.gov

*Attorney for State of Illinois*

AARON M. FREY
Attorney General of Maine

*/s/ Sarah A. Forster*
SARAH A. FORSTER
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Sarah.Forster@maine.gov

*Attorney for the State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Michael Drezner*
MICHAEL DREZNER
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us

*Attorney for State of Maryland*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine Dirks*
KATHERINE DIRKS
Assistant Attorney General
Office of the Massachusetts Attorney General
100 Cambridge Street
Boston, MA 02108
617-963-2122
Katherine.Dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

DANA NESSEL
Attorney General of Michigan

/s/ Neil Giovanatti
NEIL GIOVANATTI
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorney for the State of Michigan*

RAÚL TORREZ
Attorney General of New Mexico

/s/ Aletheia V.P. Allen
ALETHEIA V.P. ALLEN
Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
AAllen@nmdoj.gov

*Attorneys for State of New Mexico*

LETITIA JAMES
Attorney General of New York

/s/ Rabia Muqaddam
RABIA MUQADDAM
Chief Counsel for Federal Initiatives
ESTER MURDUKHAYEVA
Assistant Solicitor General
28 Liberty Street
New York, NY 10005
212-416-8240
Rabia.Muqaddam@ag.ny.gov
Ester.Murdukhayeva@ag.ny.gov

*Attorneys for the State of New York*

AARON FORD
Attorney General of Nevada

/s/ Heidi Parry Stern
HEIDI PARRY STERN
Solicitor General
KIEL IRELAND
Assistant Attorney General
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702-486-3420
HStern@ag.nv.gov
KIreland@ag.nv.gov

*Attorney for State of Nevada*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Alexander Michael Carnevale
ALEXANDER MICHAEL CARNEVALE
Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
ACarnevale@riag.ri.gov

*Attorney for State of Rhode Island*

DAN RAYFIELD
Attorney General of Oregon

/s/ Robert A. Koch
Robert A. Kock
Assistant Attorney General
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
971-673-1880
Robert.A.Koch@doj.oregon.gov

*Attorney for State of Oregon*

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-266-9226
Gabe.Johnson-Karp@wisdoj.gov

*Attorney for State of Wisconsin*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 26-510

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Washington v. Department of Education, No. 26-5098 (9th Cir.) – appeal from a related district court case, between the same parties, challenging Defendants' termination of the same mental health grants whose discontinuation is at issue in this appeal.

**Signature** s/ Ellen Range **Date** Aug 17, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-510

I am the attorney or self-represented party.

**This brief contains** 13,922 **words,** including ______ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ______.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Ellen Range **Date** Aug. 17, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

# ADDENDUM

## TABLE OF CONTENTS

**20 U.S.C. § 1228a**........................................................................................A1

**20 U.S.C. § 1232**......................................................................................... A2-A3

**20 U.S.C. § 1228a – Equity for students, teachers, and other program beneficiaries**

**(a) Purpose**

The purpose of this section is to assist the Department in implementing the Department's mission to ensure equal access to education and to promote educational excellence throughout the Nation, by—

(1) ensuring equal opportunities to participate for all eligible students, teachers, and other program beneficiaries in any project or activity carried out under an applicable program; and

(2) promoting the ability of such students, teachers, and beneficiaries to meet high standards.

**(b) Requirement to develop steps to ensure equity**

The Secretary shall require each applicant for assistance under an applicable program (other than an individual) to develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.

**(c) Establishment of criteria**

The Secretary may establish criteria and provide technical assistance for meeting the requirements of this section.

**(d) Effect on other laws**

Nothing in this section shall be construed to alter in any way the rights or responsibilities established under the laws cited in section 1221(d) of this title.

(Pub. L. 90–247, title IV, §427, as added Pub. L. 103–382, title II, §236, Oct. 20, 1994, 108 Stat. 3917.)

**20 U.S.C. § 1232 – Regulations**

**(a) "Regulation" defined**

For the purpose of this section, the term "regulation" means any generally applicable rule, regulation, guideline, interpretation, or other requirement that--

(1) is prescribed by the Secretary or the Department; and

(2) has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program.

**(b) Citation of authority**

Regulations shall contain, immediately following each substantive provision of such regulations, citations to the particular section or sections of statutory law or other legal authority on which such provision is based.

**(c) Uniform application**

All regulations shall be uniformly applied and enforced throughout the 50 States.

**(d) Application of exemption**

The exemption for public property, loans, grants and benefits in section 553(a)(2) of Title 5 shall apply only to regulations--

(1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or

(2) where the Secretary determines that the requirements of this subsection will cause extreme hardship to the intended beneficiaries of the program affected by such regulations.

**(e) Schedule for promulgation of final regulations**

Not later than 60 days after the date of enactment of any Act, or any portion of any Act, affecting the administration of any applicable program, the Secretary shall submit to the Committee on Education and Labor of the House of Representatives and the Committee on Labor and Human Resources of the Senate a schedule in accordance with which the Secretary plans to promulgate final regulations that the Secretary determines are necessary to implement such

Act or portion of such Act. Such schedule shall provide that all such final regulations shall be promulgated within 360 days after the date of enactment of such Act or portion of such Act.

**(f)Transmittal of final regulations**

Concurrently with the publication of any final regulations, the Secretary shall transmit a copy of such final regulations to the Speaker of the House of Representatives and the President pro tempore of the Senate.

(Pub. L. 90–247, title IV, § 437, formerly § 421, as added Pub. L. 91–230, title IV, § 401(a)(10), Apr. 13, 1970, 84 Stat. 169., as amended Pub. L. 103–382, title II, §§ 212(b)(1), 247, Oct. 20, 1994, 108 Stat. 3913, 3923; Pub. L. 103–437, § 7(a)(1), Nov. 2, 1994, 108 Stat. 4587.)