**No. 26-510**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

State of Washington, et al.,
*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF EDUCATION, et al.,
*Defendants-Appellants*.

On Appeal from the United States District Court for the
Western District of Washington at Seattle
Case No. 2:25-cv-01228, The Honorable Kymberly K. Evanson

---

# BRIEF OF *AMICUS CURIAE* RONALD PETRACCA IN SUPPORT OF PLAINTIFFS-APPELLEES

---

MARY ROHMILLER
ALICE W. YAO
DYLAN NICOLE DE KERVOR
POTOMAC LAW GROUP
1717 Pennsylvania Ave., NW
Suite 1025
Washington, D.C. 20006
(202) 558-5557
mrohmiller@potomaclaw.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS


Page(s)

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF AMICUS CURIAE ...............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ..........................................................................................3

I. The "Best Interest" Determination Under 34 C.F.R. § 75.253 Has Always Been Understood as Tethered to Grantee-Specific Performance and Fiscal Information. ..........................................................................3

II. The Department's Longstanding Practice Confirms That Continuation Decisions Are Based on Grantee-Submitted Reports.....................................9

III. In Nearly Half a Century, the Department Has Never Used the "Best Interest" Provision to Discontinue Grants Based on a Change in Political Priorities.........................................................................................12

IV. The Department's Interpretation Would Undermine the Coherent Regulatory Scheme Congress and the Department Established. .....................................15

CONCLUSION ......................................................................................18

CERTIFICATE OF COMPLIANCE ...............................................................19

CERTIFICATE OF SERVICE ......................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222 (W.D. Wash. 2025)….. ....................................................................................... .4, 9, 14, 15, 17

*West Virginia v. B.P.J.*, 609 U.S. ___, 146 S. Ct. 2356 (2026)..............................13

**Statutes**

34 C.F.R. § 75.253 ........................................................................... 1, 2, 3

34 C.F.R. § 75.253(a)...........................................................................4, 5

34 C.F.R. § 75.253(a)(5) ........................................................................ 2, 12, 13

34 C.F.R. § 75.253(b) ...........................................................................4, 11

**Other Authorities**

59 Fed. Reg. 30,258 (June 10, 1994) .....................................................................9

U.S. Department of Education, *Discretionary Grantmaking at ED: Answers to Your Questions About the Discretionary Grants Process* (2024)..........................8

U.S. Department of Education, *Grantmaking at ED: Answers to Your Questions About the Discretionary Grants Process* (2010)...................................................8

U.S. Department of Education, *Handbook for the Discretionary Grant Process*, ACSH-OFO-006 (2023) ("Handbook"), https://www.ed.gov/sites/ed/files/policy/gen/leg/foia/foia-ofo-f-01.pdf .... 6, 7, 14

## INTEREST OF AMICUS CURIAE[1]

Ronald Petracca respectfully submits this brief as amicus curiae in support of Plaintiffs-Appellees, the State of Washington, et al. For nearly forty-five years, from October 5, 1980, through February 8, 2025, Mr. Petracca served in the Office of General Counsel (OGC) of the United States Department of Education (Department). From approximately 2010 through his retirement, he helped lead OGC's Discretionary Grants Practice Team, which served as a central point within OGC for identifying and working through novel, complex, and cross-cutting grant issues. The Discretionary Grants Practice Team functioned as a forum for ongoing professional development and problem solving that helped ensure a consistent approach across OGC to resolving discretionary grant legal issues.

Mr. Petracca's career at the Department spanned six changes in presidential administration. During that time, he developed extensive expertise in the statutes and regulations governing the Department's competitive grant programs, including the regulations at 34 C.F.R. § 75.253 that are central to this appeal.

---

[1] Pursuant to Fed. R. App. P. 29(a), all parties have consented to the filing of this brief. In addition, pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus* represents that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no one other than amicus curiae or their counsel contributed money intended to fund preparing or submitting this brief.

Mr. Petracca's unique perspective on the historical interpretation and practical application of the continuation regulation provides this Court with information not readily available from the parties that bears directly on the regulatory construction question presented in this appeal.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court correctly held that the Department's application of 34 C.F.R. § 75.253(a)(5) is unreasonable and contrary to law. The "best interest" determination cannot be read as an unlimited license to discontinue multi-year grants based on unpublished political preferences that bear no relationship to grantee performance, fiscal management, or progress toward project objectives.

Amicus writes to confirm, based on nearly forty-five years of firsthand experience in providing legal advice on administering the Department's discretionary grant programs, that the district court's interpretation is correct and that the Department's current reading of 34 C.F.R. § 75.253 is a radical departure from how the regulation has been understood and applied since its inception.

Amicus respectfully offers the following points for this Court's consideration. First, the "best interest" determination has always been understood within the Department as tethered to grantee-specific information, including performance data, fiscal reports, and management activities, not to shifting political priorities. The government's claim that this reading renders the provision

superfluous misunderstands the regulation; the "best interest" provision serves a distinct function by allowing consideration of grantee-specific performance beyond the specific performance factors delineated in 34 C.F.R. § 75.253. Second, the Department's longstanding operational practice of making discontinuation determinations only after reviewing annual performance reports confirms this understanding; the government's characterization of its mass discontinuation notices as "individual adjudications" cannot obscure that the Department issued boilerplate decisions without examining any grantee-specific performance data. Third, in nearly half a century spanning six presidential transitions, to amicus's knowledge, the Department has never used the "best interest" provision to discontinue grants based on a new administration's policy disagreements with previously published priorities, and amicus would have advised against doing so. Finally, the government's arguments that grantee reliance was "objectively unreasonable" fundamentally mischaracterize the cooperative, procedurally-protected grant relationship that amicus helped administer for decades.

## ARGUMENT

### I. The "Best Interest" Determination Under 34 C.F.R. § 75.253 Has Always Been Understood as Tethered to Grantee-Specific Performance and Fiscal Information.

The regulatory text of 34 C.F.R. § 75.253 establishes a coherent framework for making continuation award decisions. Subsection (a) sets out the prerequisites a

grantee must satisfy to receive a continuation award, including demonstrating progress toward project goals, submitting required reports, maintaining eligibility, preserving adequate financial and management systems, and receiving "a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." 34 C.F.R. § 75.253(a). Subsection (b) specifies the "[i]nformation considered in making a continuation award," stating that the Secretary "may consider any relevant information regarding grantee performance," including "reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 C.F.R. part 200, and any other relevant information." 34 C.F.R. § 75.253(b).

The Department now argues that the "best interest" criterion in subsection (a)(5) confers essentially unlimited discretion to override every other substantive protection and discontinue a grant whenever the Department concludes that continuation no longer serves its current political preferences. The district court correctly rejected this interpretation. *Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222 (W.D. Wash. 2025).

Amicus's experience administering this regulation for decades confirms the district court's reading. Throughout amicus's tenure at the Department, the "best interest" determination was understood to be an assessment rooted in the information that grantees submitted to the Department, including performance

reports, fiscal data, and management activities. The continuation regulations establish a single integrated set of requirements. To receive a continuation award, the grantee must: (1) demonstrate progress in achieving the project's goals; (2) submit all required reports; (3) continue to meet eligibility requirements; (4) maintain financial and administrative management systems; and (5) "[r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." 34 C.F.R. § 75.253(a).

The government argues that this reading "would render the best-interest provision largely superfluous" because other requirements, such as demonstrating substantial progress toward goals and objectives, "typically capture whether a project furthers the priorities set at the start of a grant contest." Appellants' Br. at 22. This argument reflects a misunderstanding of how the continuation regulation actually operates.

From amicus's experience administering these grants, the "best interest" provision has always served a distinct function within the regulatory scheme. While the substantial-progress requirement focuses on whether the grantee is achieving its stated goals and objectives, the "best interest" determination provides flexibility to consider additional grantee-specific performance factors that may bear on whether continuation is warranted: changed circumstances affecting a project's viability, fiscal concerns not rising to the level of a management-system

failure, compliance issues that have been addressed but warrant monitoring, or situations where a grantee's approach is not achieving the intended results. The provision allows the Department to exercise judgment within the process of data-driven performance reviews, not to escape from it entirely.

The government's reading, by contrast, would swallow the entire regulatory scheme. If the "best interest" provision authorizes discontinuation based on any policy preference the Secretary might hold, then the performance requirements, the fiscal-management requirements, the reporting requirements, and the regulatory preference for continuation over new grants all become meaningless. The Secretary could simply invoke "best interest" to override every substantive protection the regulation provides. Nothing in amicus's decades of experience suggests that this is what the Department intended when it promulgated the continuation regulation in 1980, or when it amended the regulation in 1994, 2013, and 2024 to further elaborate the grantee-specific information that informs continuation decisions.

The Department's own Handbook for the Discretionary Grant Process operationalizes this understanding by mandating that discontinuation determinations are to be made "no earlier than 90 days before the end of a grantee's budget period." U.S. Dep't of Educ., *Handbook for the Discretionary Grant Process*, ACSH-OFO-006, at 286 (2023) ("Handbook"), https://www.ed.gov/sites/ed/files/policy/gen/leg/foia/foia-ofo-f-01.pdf.

This timing requirement reflects the operational reality that the Department cannot meaningfully assess whether a project has made progress, or whether continuation serves the government's interests, without first reviewing the grantee's annual performance report and corresponding fiscal and management data. There would be no reason to wait until 90 days before the end of the budget period to make this determination if the "best interest" inquiry could be satisfied by reference to the political preferences of a new administration. The Department could, and presumably would, make such determinations immediately upon a change in administration. The timing requirement confirms that the "best interest" assessment is part of the performance-review process, not separate from it.

Indeed, the Handbook makes explicit that the "best interest" inquiry is tied to whether the project continues to serve the program's original priorities, not whether it aligns with a new administration's policy preferences. The Handbook states that program offices must determine "that continuing funding is in the best interest of the Federal government (e.g., the program staff believes the project continues to serve the priorities of the program)." *Handbook* at 285. This illustrative language confirms that the "best interest" standard asks whether the project remains faithful to the priorities under which it was funded, not whether those priorities remain in political favor.

The Department's guidance to grantees reinforces this understanding. The 2024 Grantmaking memorandum instructs grantees that "[t]he program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions." U.S. Dep't of Educ., *Discretionary Grantmaking at ED: Answers to Your Questions About the Discretionary Grants Process* (2024), ECF No. 50-14, at 33. It further explains that before a continuation award can be issued, program staff reviews the performance report and financial and project management activities "to determine if [the grantee] ha[s] made substantial progress in reaching the project's objectives, if expenditures correspond to the project's plans and timelines, if the recommended funding amount is appropriate, and if continuation of the project is in the best interest of the Federal government." *Id.* A 2010 version of this memorandum contained materially identical language. U.S. Dep't of Educ., *Grantmaking at ED: Answers to Your Questions About the Discretionary Grants Process* (2010), ECF No. 141-4, at 42. The Department has consistently communicated, across administrations of both parties, that the "best interest" determination is the culmination of a data-driven review of grantee performance, not an independent vehicle for imposing new political criteria.

## II. The Department's Longstanding Practice Confirms That Continuation Decisions Are Based on Grantee-Submitted Reports.

The district court found it significant that even before subsection (b) was added to the regulation in 2013, grantees were required to submit certain information with their continuation applications, and agency guidance stated that continuation decisions would be based on that submitted information. *Washington*, 813 F. Supp. 3d at 1242. Amicus's experience confirms this historical practice.

Based on amicus's experience, since the continuation regulation was first promulgated in 1980, the Department's process for making continuation determinations followed a consistent pattern: program staff would review the grantee's annual performance report, fiscal information, and project management data, and then make a recommendation as to whether continuation was warranted. This process was conducted on an individualized, grant-by-grant basis. The review was designed to assess whether the grantee had made substantial progress toward meeting the goals and objectives laid out in the original grant application and the program's published priorities.

When the Department amended the continuation regulation in 1994, it explained that "the continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of reports as specified by the Secretary, rather than on the submission of a continuation award application." 59 Fed. Reg. 30,258, 30,259 (June 10, 1994).

This amendment was designed to simplify the continuation process for grantees, not to expand the Department's authority to evaluate grants against new, unannounced criteria. The Department was simply telling grantees that they need not reapply for continued funding because the reports they were already required to submit would serve as the basis for the continuation determination. The Department's current position that the "best interest" determination is a freestanding authority to apply unpublished political preferences is flatly inconsistent with this regulatory history.

The practical operation of the grant process further underscores why the Department's position is untenable. The Department's regulations and guidance create an integrated system in which grantees apply for funding based on published priorities, structure their projects to meet those priorities, report annually on their progress, and receive continuation awards based on the data they have submitted. This system depends on grantees being able to plan for a successful project and rely on the expectation that, if they perform well and comply with the terms of their award, they will receive the continuation funding that the Department indicated it intended to provide when it approved the multi-year project. Permitting the Department to upend this system by retroactively applying new political criteria to existing grants, as the Department did here, would undermine the very foundation of the competitive grant process.

The government nonetheless contends that its discontinuation notices were "individual adjudications" and that "[a]gencies are entitled to proceed by adjudication, including by adjudicating a group of similar matters at the same time." Appellants' Br. at 27–28. But this characterization misunderstands what the Department actually did, and what true adjudication under this regulatory scheme requires.

Individual adjudication under the continuation regulation requires consideration of individual circumstances. Program staff reviews each grantee's annual performance report, fiscal information, and management data, and then makes a recommendation as to whether continuation is warranted for that particular grant. *See* 34 C.F.R. § 75.253(b).

The Department did none of this. It issued a blanket Directive ordering the re-review of all grants against new political criteria and then sent identical, boilerplate discontinuation notices without examining a single performance report. That is not adjudication—it is the retroactive application of new, unpublished priorities to existing grants, which is precisely what the notice-and-comment process is designed to prevent. The Department's attempt to characterize these mass discontinuations as "individual adjudications" cannot obscure the fundamental departure from the individualized, data-driven process that the regulations contemplate and that the Department has historically undertaken.

The Department's reconsideration process compounded rather than cured these deficiencies. Although grantees were offered the opportunity to seek reconsideration, those requests were uniformly denied with boilerplate language, just as the original discontinuation notices. And again, instead of reviewing and evaluating individual grantees' performance reports, the Department relied solely on excerpts from grantees' original applications addressing diversity, equity, or inclusion, often quoting from the very equity statements that the Department itself had required applicants to submit.

A lawful "best interest" determination under 34 C.F.R. § 75.253(a)(5) requires more than a generalized policy objection. It requires a clear articulation of the Federal interest at stake and a specific identification of conduct by the grantee in implementing the grant that transgressed that interest. Vague references to disfavored terminology in an original grant application—terminology that may or may not have been carried out in actual project implementation—cannot satisfy this standard. The inquiry must focus on what the grantee actually did, not on whether the application contained language that a subsequent administration finds objectionable.

## III. In Nearly Half a Century, the Department Has Never Used the "Best Interest" Provision to Discontinue Grants Based on a Change in Political Priorities.

Perhaps the most telling evidence that the Department's current interpretation of 34 C.F.R. § 75.253(a)(5) is a novel departure from settled practice is the simple fact that, in amicus's forty-five years at the Department, amicus is not aware of a single competitive grant that was discontinued simply because a new administration disagreed with the priorities addressed in that grant. Although the governing regulation permits discontinuation when a grantee does not "[r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government," 34 C.F.R. § 75.253(a)(5), to amicus's knowledge, that provision has never been used to discontinue an entire cohort of grants awarded under a particular program without a project-specific assessment of each grant being discontinued.

This unbroken historical practice is powerful evidence of the regulation's meaning. The Supreme Court has recognized that an agency's longstanding, consistent interpretation of its own regulation is highly relevant to determining the regulation's meaning. *See, e.g.*, *West Virginia v. B.P.J.*, 609 U.S. ___, 146 S. Ct. 2356, 2371 (2026) (noting that Title IX regulations were "especially useful in determining the statute's meaning" because they had remained consistent over time). Here, the Department's historical practice of confining the "best interest" determination to grantee-specific assessments reflects a consistent, decades-long

interpretation that directly contradicts the expansive reading the Department now advances on appeal.

The district court noted the testimony of grantees indicated that grant discontinuances or terminations were extremely rare before 2025 and typically only occurred in cases of misconduct, usually with prior notice and opportunities to respond and correct any underlying issues. *Washington*, 813 F. Supp. 3d at 1243 n.9. Amicus's own experience confirms this characterization. Termination or discontinuation of any type of competitive grant was exceedingly rare during amicus's tenure. The Department's own Handbook provided that program officials were to "act to suspend or terminate a grant only under egregious circumstances" and were required to "consult with their program attorney to determine if suspension or termination actions are appropriate." *Handbook* at 331.

As a Senior Counsel within OGC, had amicus become aware that program staff intended to send a notice of non-continuation based on a change in political priorities, amicus would have advised the Department that doing so would not be legally defensible. This is not merely one attorney's personal legal opinion; it reflects the prevailing understanding within OGC—the office responsible for providing legal guidance on discretionary grant issues—throughout amicus's decades of service. The Department's attempt to recast the "best interest" provision

as an unconstrained political tool is inconsistent with how the Department's own lawyers understood the regulation for as long as the regulation has existed.

## IV. The Department's Interpretation Would Undermine the Coherent Regulatory Scheme Congress and the Department Established.

Adopting the Department's interpretation would allow the coherent scheme established in the continuation regulation to be upended by a vague, undefined "best interest" determination. Amicus's experience illustrates the practical consequences of the Department's reading.

If the Department were free to discontinue grants at any time based on a new administration's unpublished political preferences, the entire structure of the competitive grant system would be destabilized. Applicants could not plan multi-year projects with any confidence. Universities and school districts could not make staffing and resource commitments. The rigorous peer-review and selection process would be reduced to a formality because the criteria that governed the initial award could be discarded at any time through the back door of the "best interest" determination. And as the district court found, the Department could "entirely disavow the published priorities selected at the outset of a grant competition and re-evaluate multi-year grantees on the basis of new, unpublished objectives under the guise of a 'best interest' determination," *Washington*, 813 F. Supp. 3d at 1244, thereby executing an end-run around the statutory requirement of notice-and-comment rulemaking.

Any attempt to analogize the "best interest" provision to termination-for-convenience clauses in government procurement contracts is fundamentally misplaced. Unlike procurement contracts, which are commercial transactions negotiated between a contracting officer and a vendor, discretionary grants are awarded through the aforementioned multi-step process mandated by statute and regulation to fund activities carried out for the public good. The grant relationship is cooperative, not commercial: the government establishes expectations, grantees work to meet them, and continuation decisions follow from objective assessment of progress. Procurement contractors understand they operate in a commercial marketplace and that contracts may be terminated for the government's convenience, and this risk is priced into their bids. Grant recipients, by contrast, are typically universities, school districts, and nonprofit organizations that invest substantial institutional resources in designing multi-year programs based on the Department's published priorities and express indication of intent to continue funding.

The Department's actions in this case illustrate the danger precisely. As detailed in Section II, the Department issued a blanket Directive and sent identical, boilerplate discontinuation notices without examining a single performance report. This is not what the continuation regulation was designed to do. It is, as the district court aptly described it, a "surreptitious[]" attempt to "r[u]n a new grant contest

evaluating existing original grant applications against new unpublished priorities." *Washington*, 813 F. Supp. 3d at 1245.

The government's arguments on appeal do not salvage its position. The government contends that grantees' reliance on continuation funding was "objectively unreasonable" because the grant agreements stated that continuation was not guaranteed and the Administration's policy preferences were "well publicized." *See* Appellants' Br. at 31–32. This argument fundamentally mischaracterizes the nature of the grant relationship and the settled expectations that governed it for decades.

Amicus's forty-five years administering these grants confirms that the disclaimer language in grant agreements stating that continuation depends on the Secretary's "best interest" determination has always been understood as referring to the performance-based continuation process, not as a license for blanket political discontinuation. The disclaimer notified grantees that continuation was contingent on satisfactory performance, fiscal compliance, and progress toward project objectives. It was never understood as reserving authority to discontinue entire cohorts of grants based on a new administration's policy disagreements with previously published priorities. The suggestion that reliance was unreasonable because policy preferences were "well publicized" inverts the regulatory scheme:

grantees are entitled to rely on published priorities in the Federal Register, not to scan the political landscape for signals that the rules might change.

In nearly half a century, grantees who met their performance objectives, met their reporting responsibilities, were properly managing and accounting for their grant funds, and complied with published priorities received continuation awards. That unbroken practice created legitimate expectations that the government cannot now dismiss as "objectively unreasonable." The Department's own lawyers never understood the regulation to permit what the Department has now done.

## CONCLUSION

For the foregoing reasons, amicus curiae Ronald Petracca respectfully urges this Court to affirm the district court's order granting Appellees' motion for partial summary judgment and denying Appellants' cross-motion.

Dated: August 24, 2026

Respectfully submitted,

/s/ *Mary Rohmiller*

Mary Rohmiller
Alice W. Yao
Dylan Nicole de Kervor
POTOMAC LAW GROUP
1717 Pennsylvania Ave., NW
Suite 1025
Washington, DC 20006
(202) 558-5557
mrohmiller@potomaclaw.com

*Attorneys for Amicus Curiae*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** **26-510**

I am the attorney or self-represented party.

**This brief contains** **3690** **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Mary Rohmiller* **Date** **8/24/26**

*(use* "s/[typed name]" *to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Mary Rohmiller*
Mary Rohmiller